# Staunton

## Life and Casualty Insurance Company of Tennessee v. Unemployment Compensation Commission of Virginia, Etc.

September 10, 1941.

Record No. 2435.

Present, All the Justices.

The opinion states the case.

*Denny, Valentine & Davenport,* for the appellant.

*Abram P. Staples, Attorney-General,* and *Kenneth C. Patty, Assistant Attorney-General,* for the appellees.

GREGORY, J., delivered the opinion of the court.

Life and Casualty Insurance Company of Tennessee has appealed from a decree of the Hustings Court of the city of Richmond in which it was held liable under the provisions of the Virginia Unemployment Compensation Act for contributions on the earnings of one Ballowe and its other agents of the same grade or class operating within Virginia for the years 1937, 1938 and 1939.

This proceeding had its inception in the resignation of Ballowe requested by the appellant because of the former's misconduct. He had been, prior to his resignation, an industrial life insurance agent for the appellant. After resigning he filed his claim with the Virginia Unemployment Compensation Commission for benefits under the act. The commission held that Ballowe and all other agents of the appellant of the same grade or class were in the employment of the appellant, and, therefore, it was required to file with the commission a report of all wages paid these agents for the years named and to make contributions accordingly. The Hustings Court, upon appeal, affirmed the decision of the commission. The case has now reached this court for final disposition on appeal in accordance with the provisions of section 1887(98), (i) of the 1938 Supplement to the Virginia Code of 1936 (Michie).

The findings of fact by the commission are as follows:

"1. The contract between the claimant and the company contains the following language in paragraph 14:

" 'The agent has been duly licensed by the State to follow the profession of Licensed Insurance Agent, and shall be construed to be an Independent Contractor, his compensation being what he can realize from his efforts under the above Schedule. Both the Company and the agent are interested only in the results to be produced by this contract. Any practices, or procedure adopted relating to the execution of this contract are solely for the purpose of a more efficient conduct of the business in order to produce results mutually beneficial.'

"2. The claimant was compensated on a commission basis, based upon a schedule set forth in the contract, with a drawing account of $20.00 per week, plus an allowance of $1.50 per week expense, which $20.00 per week was an advance against earned commissions, and not a salary in its ordinary meaning. However, the company makes no attempt to collect back any portion of this advance that may not be absorbed by earned commissions.

"3. Claimant was handed a 'debit' at the time he entered into his contract. A 'debit', as we understand the term, is a list of policyholders, showing the amount of weekly premium due by each, and the agent is responsible for the collection of the premiums shown on said list. New policies written by the agent are added to this list. The agent's success as a money maker depends upon his ability to increase the business shown on the debit—the premiums receivable. The debit assigns the territory to be worked by the agent. However, if a policyholder moves from that territory to another, the agent is free to continue to service the policy or transfer the debit to another agent. The agent is also at liberty to solicit business in territory in Virginia outside the area prescribed by the debit.

"4. There is attached to the Richmond office a District Manager, who is in charge of the company's business in the area served by said office, and, under his supervision, supervisors or superintendents are employed, available to the agents as advisors or assistants.

"5. The office of the company is open each morning at 8:00 a. m. and while it may not be compulsory by rule of the company for the agents to report at the office at that time, it is clear that a strong effort is made to induce them to report. The claimant stated, and it is not contradicted, that when he was unable to report at the office by 8:00 a. m., he would telephone the office and explain why he was detained.

"6. The agent is required to file, at least once each week, a report of business obtained and collections made.

"7. From time to time staff meetings are held at which the agents are urged to be present. It does not appear, however, that the agents are compelled to attend these meetings—that is, it is not shown that absence from these meetings is considered, by itself, sufficient ground to warrant a discharge from the service.

"8. When an agent resigns, or is otherwise separated from the company, he is required to make a final settlement and surrender to the company the 'debit' or list of accounts charged to him.

"9. Upon entering the service of the company the agent is required to post a bond of $100.00 to indemnify the company against loss or misappropriation of money collected by him.

"10. There is established and maintained in the agency a 'Boosters' Club' made up of the personnel of the agency, including agents of the grade and class as the claimant, and each member of this club is assessed a fine of ten cents by the club upon his failure to be at the office at 8:00 a. m. The 10c collected from each tardy individual does not go into the company's fund but is kept separately in the company's vault for the benefit of the club. This money is used to buy flowers for the sick, etc. This organization unquestionably has the sanction and approval of the company.

"11. The company furnishes the agent rate books, forms and all material necessary to carry on the business assigned to him.

"12. The agent is permitted to sell 'ordinary life' policies, and is required to collect premiums and renewal premiums on such policies sold by him.

"13. All applications for insurance must be approved by the home office of the company."

The appellant concedes that all of the findings of fact, except number 12, are supported by the evidence. We think number 12 is also supported by the evidence, but

if not supported, it does not affect the ultimate decision of the case.

The act prior to the amendment of 1940 controls here. It was amended in 1938 (see Acts 1938, Chap. 446, page 1004), and the pertinent portion is carried in the 1938 Supplement to the Code of 1936 as section 1887(94), (j), (1). It reads in part as follows: "Subject to the provisions of this subsection (j) 'employment' means service, including service in interstate commerce, performed for remuneration or under any contract of hire, written or oral, express or implied."

The foregoing definition is qualified as follows (see Code, section 1887(94), (j), (6), 1938 Supplement): "Services performed by an individual for remuneration shall be deemed to be employment subject to this Chapter unless: (a) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and (b) such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; or such individual, in the performance of such service, is engaged in an independently established trade, occupation, profession or business."

We have for determination under the Virginia Unemployment Compensation Act the relation existing between the insurance company and Ballowe and the other agents of the Life and Casualty Insurance Company of the same grade or class operating in Virginia during 1937, 1938 and 1939. If they were in the "employment" of the insurance company within the meaning of the Virginia Unemployment Compensation Act the insurance company is liable for the contributions or payroll taxes, as specified in the act, on the wages earned by these agents for the years mentioned.

Code, section 1887(94), defines the meaning of many of the words and terms of the statute. "Contributions" mean the taxes imposed and collectible under this statute. "Employing unit" means any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company, etc. "Employer" means any employing unit which has had for a specified time, eight or more persons "in employment". We have already noted that "employment" means service performed by an individual for remuneration. "Wages" means all remuneration payable for personal services, including commissions, bonuses, etc.

The statute in express terms mentions and comprehends insurance companies as "employing units", and "commissions", the usual mode of compensating insurance agents, as wages.

The appellant contends that the Virginia Unemployment Compensation Act is nothing more than declaratory of the common law or rather a legislative definition of the common-law concept of master and servant and independent contractor; that the statutory definition of "employment" is simply the adoption by the legislature of the common-law definition of servant contained in the law of master and servant, and that the insurance agents involved here are not servants as defined by the common law, but independent contractors. With this we do not agree.

The agents have performed service for remuneration under a contract of hire and such service is deemed to be "employment" subject to the act, unless they are exempt under either (a) or (b) above. The burden is upon the appellant to show that the service rendered it by them for remuneration does not constitute "employment" under the act.

To bring the agents under either one of the exceptions designated as (a) and (b) under Code, section 1887(94), (j), (6), set forth above, the appellant must demonstrate that it has no control or direction over the

services of the agents, and that the services are either outside the usual course of appellant's business or that the services are performed outside of appellant's places of business, or that the agents were "engaged in an independently established trade, occupation, profession or business".

In speaking of control the Unemployment Compensation Commission of Virginia had this to say:

"Was this claimant in fact free from control? We think that from the record it is a fact that the agency office was the office and headquarters of the claimant. He had no other office and he was free to use the facilities of the agencies (agency's) local office. The claimant and the agency manager operated from the same center of activity. The company furnished the claimant his debit which debit undoubtedly had the effect of assigning the claimant to the territory covered by the debit. In effect the claimant was told and directed to service the policyholders living in the area shown on the debit. That was his first and primary duty to be performed. The fact that it was to the interest of both the company and the claimant to permit the claimant to search for new business in sections of Virginia outside the area assigned by the debit is, we think, of no consequence. That is an enlargement of the agent's scope of activity without relieving him from the duty of prime importance— to collect the premiums as directed by the debit, and make settlement at least once a week. The claimant's right to remain in the service of the company was dependent, among other things, upon a satisfactory accounting with respect to the debit."

And again in speaking of being "engaged in an independently established trade * * * or business" the commission said:

"We think that it is elemental that one engaged in an independent enterprise, business or profession has a proprietary interest therein to the extent that he can operate it without hindrance from any individual or force what-

soever. These agents. have no business to which they have a right to continuity. They have nothing they can sell or give away. All they have is subject to cancellation and destruction upon severance from the company's service. The contract may be terminated by the company at any time without liability on its part for damages for breach of contract—a fact which negatives the existence of an independent relationship."

And in construing "usual course of business" and "places of business" the commission used this language:

"The second criterion (b) is as follows:

" 'Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; * * * .' " ·

"The service performed by the agent is the essence of the insurance business. About this there can be no dispute. Therefore, we hold that the service performed by the claimant was not outside the usual course of the company's business.

"We do not construe 'places of business' to mean the headquarters of the employer or the office premises of the employer but of all the places of business. We think that the territory shown on the debit is one of the 'places of business' of the company. The debit list is the property of the company, handed to the agent to be serviced. The 'places of business' include the office of the company as well as the 'business territory' shown on the company's debit. Under such circumstances the places where the agents make collection for the company are the places where the company carries on its business. Moreover, the agent has the right to use, and actually uses, the facilities of the company's office to prepare reports and make settlements. We think it clear that the service performed by the claimant was not performed outside of all the places of business of the company. The company has failed to carry the burden of show-

ing that the service was performed at any other place."

With these conclusions of the commission we agree.

 In construing statutes the legislative definition should prevail. In determining the meaning of "employment" we are bound by the statutory definition of that word rather than by the common-law meaning of the master and servant relation. The employer to be entitled to exemption from making the contributions must show that he is within one of the statutory exceptions, and not that he would not be bound under the master and servant relation. It was the intent of the legislature, as expressed in the language used, to make the act broader and more inclusive than the ordinary relation of master and servant.

An informative note may be found in Washington and Lee Law Review, Vol. 1, at page 232.

 Tort cases and those arising under the Workmen's Compensation Statutes are not relevant. We are confined here to the single proposition of whether these insurance agents are in employment under the Virginia Unemployment Compensation Act.

The Virginia act is substantially like the acts of the States of Washington, Utah, Oregon, Colorado, New Jersey and North Carolina. The States of Colorado and North Carolina have held that life insurance agents are within the respective acts of those States. Their Unemployment Compensation Acts are in all material respects similar to the Virginia act.

In *Industrial Commission* v. *Northwestern Mut. Life Ins. Co.*, 103 Colo. 550, 88 P. (2d) 560, the court after holding insurance agents subject to the act held: "Here the statutory definition of 'employment' is broad and inclusive, and it cannot be so construed as to limit the meaning to the relationship of master and servant without violating the legislative intent."

In *Unemployment Compensation Commission of North Carolina* v. *Jefferson Standard Life Ins. Co.*, 215 N. C. 479, 2 S. E. (2d) 584, life insurance agents were held to

be in "employment" under the Compensation Act and embraced therein. This is a leading case on the subject.

The North Carolina court, speaking through Justice Clarkson, has this to say at page 589:

"It is not surprising that a wide disparity of views is appearing, since not only are the different cases raising the question argued upon a number of different theories, but there are numerous variations apparent in the respective state unemployment compensation acts. Such variations in the state laws and the interpretations given them are but reflections of the considerable latitude necessarily allowed the individual states to the end that they may work out compensation acts suited to their own peculiar needs. In the words of the late Justice Cardozo, speaking to this point in *Steward Machine Company* v. *Davis*, 301 U. S. 548, 593, 594, 57 S. Ct. 383, 394, 81 L. Ed. 1279, 109 A. L. R. 1293: 'A wide range of judgment is given to the several states as to the particular type of statute to be spread upon their books. * * * What they may not do, if they would earn the credit, is to depart from those standards which in the judgment of Congress are to be ranked as fundamental. Even if opinion may differ as to the fundamental quality of one or more of the conditions, the difference will not avail to vitiate the statute.' Accordingly, it would appear settled that the matter here involved is one of state law, to be interpreted finally by this Court.

"The scope and purpose of the present Act are exceptional in breadth. The draftsmanship of the definition section, which gives flesh and sinew to the whole, shows a carefully considered and deliberate purpose to leap many legal barriers which would halt less ambitious enactments. As far as language will permit it, the Act evinces a studied effort to sweep beyond and to include, by re-definition, many individuals who would have been otherwise excluded from the benefits of the Act by the former concepts of master and servant and principal and agent as recognized at common law."

The North Carolina case was reaffirmed in *State of North Carolina* v. *National Life Ins. Co.*, handed down at the Spring 1941 term and not yet reported.

We are told by counsel for appellant that after the Colorado and North Carolina courts had held life insurance agents within the Unemployment Compensation Acts of those States, their respective legislatures amended their respective acts and expressly exempted them. It is argued that this manifested a legislative intent to place insurance agents beyond the act. This, of course, is of no concern here. The burden is upon courts to interpret the law as it is written. We do not determine the wisdom of a statute; we only ascertain the intention of the legislature. Here the legislature defined certain words and terms it thought important. The clear intent of the legislature in its definition of those words and terms was to bring insurance agents within the act. If in the future the legislature wishes to exclude insurance agents, it can do so by amending the act.

It, of course, could not be successfully maintained that the services of the agents were outside the usual course of the business of the appellant. It is the business of the insurance company to sell insurance through its agents.

Likewise, it could not be maintained successfully that all of the services rendered by their agents were performed outside of the place of business of the appellant. When the appellant gives the agent a "debit" it certainly impliedly directs him to go into the territory in which the insured persons live, and the service performed there by the agent necessarily is within (and not outside) all the places of business of the appellant.

The commission has properly held that agents were not engaged in an independently established trade, occupation, profession or business.

There is an immaterial distinction between the Virginia act and the statutes in North Carolina, Colo-

rado and the other States which have construed their own statutes. The distinction is found in the last, or third, qualification immediately after the semicolon under (b), where in the Virginia statute "or" is used instead of "and" which is found in the statutes of other States. From this it is earnestly argued that the North Carolina and Colorado cases would have excluded insurance agents from their respective statutes if they had been identical with the Virginia statute. We do not agree with this argument. The fact that in the Virginia statute the third or last qualification is in the disjunctive rather than in the conjunctive can make no difference.

Under our statute if the employer can show that the individual is engaged in an independently established business, under the third or last qualification, that, without more, would eliminate the requirement that it be shown by the employer that the individual is free from his control. In other words, if the individual is engaged in an independent enterprise, it necessarily follows that he is free from control of the alleged employer, and he would not be within the act even though his services might be performed in the usual course of business of the alleged employer.

We think the decree of the trial court should be affirmed.

*Affirmed.*