# Richmond

## Sinclair Refining Company, et al. v. Unemployment Compensation Commission of Virginia.

June 20, 1949.

Record No. 3499.

Present, Hudgins, C. J., and Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*Denny, Valentine & Davenport, Wilbur C. Hall, Everett L. Dodrill* and *Edwin C. Wellman,* for the appellants.

*J. Lindsay Almond, Jr., Attorney General,* and *Kenneth C. Patty, Assistant Attorney General,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

The question raised by this appeal is whether the services performed by certain persons under contracts with Sinclair Refining Company, a corporation, and its wholly owned subsidiary, Sherwood Brothers, Incorporated, are within the provisions of the Virginia Unemployment Compensation Act,* so as to render those corporations liable for the payroll taxes for the period January 1, 1943, to June 30, 1945, inclusive, on the wages of such persons.

The two corporations will sometimes hereinafter be referred to as appellants, except where the context indicates only one is involved, in which event Sinclair Refining Company will be referred to as Sinclair, and Sherwood Brothers, Incorporated, as Sherwood. The Unemployment Compensation Commission of Virginia will be referred to as the Commission.

In July, 1945, each appellant submitted a written request to the Commission for a ruling that its commission agents and commission truck drivers were independent contractors, and not employees under the provisions of the Unemployment Compensation Act. They subsequently filed applications for refund of payroll taxes paid by them on remuneration received by their commission agents and commission truck drivers, from and after January 1, 1943, which exceeded the operating expenses of said agents and truck drivers for the period involved.

By consent of parties the petitions and applications of the appellants were heard together.

The Commission held that the persons involved and their helpers, in the performance of their services to appellants, were in the employment of the appellants, and denied the applications for refund of contributions theretofore paid.

---

*Acts 1936-7, Ex. Sess., ch. 1, p. 3, as amended by Acts 1938, ch. 446, p. 1004, Acts 1940, ch. 333, p. 538, Acts 1942, ch. 317, p. 446, Acts 1944, ch. 181, p. 226; Michie's Code of 1942, section 1887 (93) *et seq.*, 1944 Supp., section 1887 (94) *et seq.*

The Circuit Court of the city of Richmond affirmed the holding of the Commission. Hence this appeal.

The pertinent evidence before the Unemployment Compensation Commission may be summarized as follows:

Sinclair is engaged in the business of refining petroleum. Both it and Sherwood are also engaged in the distribution and sale of petroleum products—Sinclair in forty of the States and Sherwood in only a few of them. Distribution involves the transportation of the petroleum products from refineries to bulk distributing plants located at various places throughout the country. In Virginia, Sinclair owns twenty-nine bulk storage plants on land owned or leased by it. Such plants consist of a storage tank, a small warehouse, and, generally, a pump house. In Richmond and Portsmouth, Sinclair operates its plants directly under salaried employees. From its plants it distributes its products through distributors known as commission agents and commission truck drivers. The commission agents have charge of the bulk distributing plants and sell and deliver the products transported to the plant by the appellants. The truck drivers take their supplies from a "metropolitan storage plant" in trucks provided by themselves, and sell and deliver to customers in the same manner as the commission agents. Sherwood has but one storage plant and one commission agent.

The commission agents of Sinclair and Sherwood operate under the terms of an identical agreement which is designated as Form 35. The pertinent portion of that contract provides that the agent "may act as the agent" of the corporation within certain specified territory under and subject to the following terms and conditions:

"1. The Agent shall receive, care for and sell, exclusive of other similar products, the oils, lubricants and other products (herein referred to as 'products') that the Company supplies for sale, and shall deliver and collect for all products thus sold, it being understood that all such products shall remain the property of the Company until sold and that the proceeds therefrom shall be the property of the Com-

pany and subject to its orders; and without additional charge therefor shall assist in making collections of such accounts in Agent's territory as the Company may deliver to Agent for that purpose, including those accounts special herein.

"2. The Company shall specify the prices at which products entrusted to the Agent shall at all times be sold.

"3. Unless otherwise directed, the Agent shall make daily deposit of all collections in the bank designated by the Company, and shall each day secure and transmit evidence of such deposit in the form of a receipted deposit slip, certificate of deposit or cashier's check, as the Company may direct; and shall on the following days or dates, . . . . . . . . . . . ., or as often as the Company may direct, report all sales, collections, deposits and remittances on forms provided by the Company, such report to show sales collections, deposits and remittances made from date of last previous report to and including date of current report.

"4. The Agent shall submit to the Company an inventory of all products remaining on hand on the last day of each month, or on such other business day as the Company may direct for closing monthly business.

"5. The Agent shall send all reports, evidences of deposit remittances, inventories, and correspondence to the Company at . . . . . . . . . . . ., except as otherwise directed by it.

"6. The Agent shall obtain prompt return from customers of all shipping barrels (heavy steel drums) and furnish strict accounting thereof, and of all light iron barrels returned for credit by customers, reporting the number to be credited to each customer by name; and shall make such disposition of all containers as the Company may direct.

"7. The Agent shall not extend credit to any customer without first securing permission in writing from the Company so to do, and shall withdraw any credit so extended when so directed by the Company. The Agent shall be liable to the Company for any loss sustained through violation of these provisions. The Company is authorized, at

its option, to charge the Agent with the invoice value to customers of products delivered in violation of such provisions, and shall have the right to deduct and retain for its own use said invoice value from any monies that may then be due or which thereafter may become due the Agent; and such deduction shall be construed and accepted as payment of commissions hereunder.

"8. The Agent shall at Agent's own expense furnish necessary teams, trucks, motive power, drivers, labor, water, light, power, and heat, and shall also pay all necessary expenses in draying the Company's products and equipment and in making sales, deliveries, and collections. The Agent shall also at Agent's own expense apply for in Agent's own name and have installed at Agent's headquarters a telephone which shall be listed in the proper telephone directory and other directories in the name of Sinclair Refining Company with the street address of Agent's headquarters. All charges for local and long distance calls made by means of such telephone, whether such calls be of a business or private nature, shall be for the account of the Agent, and the Company shall not in any case be obligated to pay any such charges or to reimburse the Agent for any payments so made. The Company may pay any such charges and deduct the amounts so paid from any commissions due then or thereafter to become due the Agent.

"9. Agent shall be responsible for, and hereby assumes all responsibility for, any and all acts of Agent's employees, whether they be acts of commission or omission, resulting in loss or damage to the Company, and Agent hereby agrees to indemnify, save harmless, and reimburse the Company for and on account of any such acts of Agent's employees.

"10. The Agent shall be liable to the Company for any demurrage or storage charges assessed by the Railroad owing to Agent's neglect to promptly unload and release tank cars and other railroad cars, or to take out merchandise shipments consigned to Agent's station.

"11. The Agent shall: (a) perform Agent's duties in a businesslike manner; (b) employ no improper, questionable or illegal methods in soliciting or securing business; (c) observe the price schedules of the Company and its rules and instructions applicable to agents and any special instructions given Agent by the Company; (d) make reports and transmit information to the Company at the time and in the form and manner required by it; (e) do nothing detrimental to the business standing and best interests of the Company; (f) exercise due vigilance in protecting the equipment, property and products of the Company, notifying it promptly in writing of any condition which may arise requiring its attention.

"12. If Agent herein is an idividual, Agent shall furnish surety bond acceptable to the Company in form and amount to fully protect and indemnify the Company against loss of any monies, values, products, goods, wares, merchandise, equipment, or property entrusted to him or coming under his control or into his hands as such Agent.

"13. In consideration of the fulfillment of the stipulations, obligations and requirements hereof, and as full payment for any and all service performed by Agent hereunder, the Company agrees to pay semi-monthly to Agent commissions on sales and deliveries made by Agent in Agent's territory in accordance with the rates specified in the schedule set forth below:

\*      \*      \*      \*      \*      \*

"14. In lieu of making semi-monthly payments of commissions to Agent, as provided for in Paragraph No. 13, the Company shall have the right, unless prohibited from so doing by any law in effect in Agent's territory, to pay to Agent as an advance payment of commissions earned during the first half of each month such portion of Agent's commissions as the Company may determine based upon its estimates thereof. The amount of such advance so paid to Agent shall be deducted and withheld by the Company from the amount of Agent's commissions actually earned

during and payable for the month in which such advance payment shall have been made.

"15. No commissions shall be paid to Agent on any sale or delivery unless specified in the foregoing schedule and unless delivery is made by Agent. No commissions shall be paid to Agent on sales or deliveries to wholesalers, jobbers or distributors, or on sales or deliveries from refineries or other supply points into Agent's territory, or on sales of the Company's products in connection with the selling or leasing of a station or other property owned or leased by the Company. The Company shall have the right to withhold payment of commissions on any sale or delivery made by Agent until payment therefor has been made to the Company. The Company shall also have the right to change any rate of commission specified in said schedule by giving fifteen (15) days' written notice to Agent, provided that no such change shall change or modify any other condition of this agreement.

"16. Since under this commission agency agreement the Agent is obligated to pay out of the commissions provided for herein certain items of expense incident to the agency, it is mutually recognized and understood that, as to agents who are individuals, said commissions, to the extent of such expenses, do not constitute remuneration for the Agent's personal services within the meaning of the Federal and State Laws imposing taxes on employment or taxes or contributions for unemployment insurance or old age retirement benefits, pensions or annuities, and the Company may therefore, in making payment of such commissions, divide such payments between (a) the amount of certain items of expense to be specified by the Company and to be reported by the Agent on forms to be furnished by the Company, and (b) the balance of such commissions due.

"17. The Company reserves the right to reject either with or without cause and without assigning to the Agent any reason for such action, any orders taken by the Agent. No commissions are to be paid on rejected orders or on

orders cancelled by purchasers. In computing and paying any commissions earned under this agreement, or any other sum that may be due the Agent from the Company, there shall be deducted therefrom and retained by the Company for its own use sums equivalent to commissions which the Agent may have theretofore received from sales upon which customers have permitted their accounts to become past due, or have returned the products for credit, and any other like items reducing the Company's net cash receipts from such sales.

"18. The Agent hereby assumes all responsibility and full liability to the Company, and hereby agrees to indemnify and reimburse it, for any shortages or losses in sales, collections or deliveries hereunder, or in the products, equipment or property of the Company entrusted to Agent or coming under Agent's control including responsibility and liability for losses of Company funds by reason of theft, robbery or burglary, and the Agent hereby authorizes the Company to deduct from any and all monies due to and earned by the Agent during the life of this agreement, and retain for its own use, amounts for the payment of such shortages or losses; and the Agent agrees that Agent's liability hereunder shall be that of an insurer, except as to losses resulting from fires not due to Agent's negligence.

"19. The Agent agrees to and does hereby accept full and exclusive liability for the payment of any and all taxes and contributions for unemployment insurance and for old age retirement benefits, pensions and annuities now or hereafter imposed by the Government of the United States, and by the Government of any State of the United States, which are measured by the wages, salaries or other remuneration paid to persons employed by the Agent, for Agent's own account, for work the Agent is required to perform or have performed under the terms of this agency agreement and the Agent further agrees that, in order to relieve the Company of any liability for such taxes or contributions, Agent will do everything necessary from time to time to comply with,

or bear the burden of contesting, any regulations and any amendments thereto, which may be promulgated by the administrative authority under such applicable law. The Company shall have the right to withhold from commissions due Agent the amounts of such taxes and contributions for the purpose of paying same direct to proper State and Federal authorities; and Agent agrees to furnish Company such information as may be requested by the Company with respect to payrolls and employees of the Agent.

"20. If Agent is a corporation, the Agent hereby agrees, at Agent's own expense, to provide and maintain in effect workmen's compensation insurance, securing the payment of compensation to Agent's employees, or employer's liability insurance in accordance with the laws of the States in which Agent performs work under this agreement.

"21. This agreement cannot be assigned in whole or in part by Agent without the consent of the Company in writing first obtained. The Agent shall incur no indebtedness of any character whatsoever in the name of the Company, nor obligate the Company in any manner without first securing written authority so to do from the Manager of the District in which Agent is located. The Company shall not be responsible for any unauthorized debts or obligations incurred by the Agent.

"22. If the Agent shall handle and deal in products other than those supplied for sale by the Company, Agent shall not permit the same to interfere with Agent's obligations and duties hereunder.

"23. At any time during the life of this agreement or at the termination thereof the Company shall have the right to audit the books, accounts, inventories and stocks on hand; and the Agent shall afford the Company and its employees full cooperation and assistance in making such audit or audits.

(Paragraph 24 is to apply and is to be filled in only if Agent is a corporation.)

"24. The Agent hereby designates ................,

one of its employees, as its duly authorized representative to receive products from the Company, to execute receipts for same, to make reports and transmit information to the Company at the time and in the form and manner required by the Company, and the Agent hereby agrees that any and all acts of said representative shall be deemed to be the acts of the Agent. The Agent shall have the right to change its designated representative, provided written notice of such change shall be first given to the Company at its District Office at ....................

"25. Either party may terminate this agreement at any time with or without cause; and upon the termination thereof the Agent shall forthwith deliver to the Company or its representatives all equipment, property, products, monies, credits, books of account, and station records of whatsoever form, entrusted to Agent or coming under Agent's control.

"26. This agreement cancels and supersedes all previous agency agreements between the parties. The counter-parts hereof held by the Company are to be considered the originals, and shall be the binding agreement in the event of any variation between such counter-parts and the one held by the Agent, and such counter-parts held by the Company shall constitute the full and entire agreement between the parties hereto. All proposals, negotiations, and representations with reference to the matters covered by this agreement are merged in this instrument, and no amendment or modification of this agreement shall be valued unless evidenced by a writing signed by a representative of the Company authorized to sign this instrument."

At the hearing a special representative of Sinclair testified that it was his duty to assist commission agents in their efforts to develop business; that he did not give directions to the agent "in the sense that he is directed," but, if necessary, did request that he conduct his business on a businesslike basis; that the agents are carefully selected on the basis of their standing and influence in the community and their business experience; that agents could employ help free from

interference by Sinclair; and that although the agents are sometimes permitted to vary from their contract, Sinclair, nevertheless, retained the power to require them to adhere to its strict terms.

He further testified that commission truck drivers make sales to their customers in the same manner as commission agents, and that, in general, the contract with such drivers was substantially the same as that made with the agents. Truck drivers under their contract are required to sell at prices fixed by Sinclair, to daily turn over to Sinclair all collections made, together with such reports as may be required of them on forms furnished by Sinclair, and are forbidden to extend credit without Sinclair's consent.

A special representative of Sherwood testified that the commission agent of his company operated in the same manner and under the same conditions as that of agents of Sinclair.

In addition, three of the commission agents of Sinclair testified somewhat at length regarding their methods of operation. They said that at a heavy cost to them, they purchased or leased trucks, truck tanks, and other necessary equipment for the delivery of the products from the storage plant of Sinclair to retailers and consumers; that they selected their own employees, determined their hours of employment, conditions of employment, rate of pay, and paid them; that if they (the agents) extended credit to any customer without approval by Sinclair, they personally carried that credit and made proper accounting to Sinclair; that they gave such time to their business as they saw fit and engaged in other lines of business with which that of Sinclair had no connection; that they paid all costs of operation, labor, upkeep of delivery equipment and facilities out of their own funds; that their trucks were painted with signs running the length thereof reading "Sinclair," with their name sometimes added on the vehicle; that Sinclair paid for the paint used in painting the trucks; that the advertising of the business was paid for, after being first ap-

proved by Sinclair, on a fifty-fifty basis; that some of them had two telephones, one in the name of Sinclair and the other in the name of the agent; that Sinclair had the title to the plant and its contents and had applied and paid for a wholesale commission merchant's license for operation of the bulk plant in its name; and that, in general, they complied with the terms of their contract. It appears that sometimes a commission agent took out a retail license in his own name.

The Commission found "The facts are undisputed that in the performance of the service under the contract:

"(1) The Commission Agent is a mere consignee holding no title to the products entrusted to him for sale.

"(2) The sales are made strictly as agent or servant of the actual seller of the products.

"(3) The owner (Sinclair or Sherwood) of the products fixes the sales price and has authority to terminate the agency relationship if the fixed sale price is at any time changed.

"(4) If the sale is for cash the agent must give a receipt for the money received on a form furnished by the seller. This form shows on its face that the payment is received by the agent, not for his own account, but for Sinclair or Sherwood.

"(5) The money received from all sales must be deposited daily to Sinclair's credit in a bank designated by Sinclair.

"(6) The agent is without the power to sell to customers on credit, without first obtaining the seller's approval. The seller has the power to terminate the agency relationship for violation of this provision.

"(7) The agent must furnish the seller, on a form furnished by it, a daily report of sales. He must also furnish the seller a daily cash report.

"(8) The agent is required to maintain a daily perpetual inventory of the seller's products on hand and make periodical reports of such inventory to the seller.

"(9) The agent is compensated by way of commission,

but he is not permitted to deduct his commissions, but such commissions are determined periodically by the seller and payment to the agent is then made.

"(10)  The agent must provide and list a telephone in the seller's name."

■ We have been favored with excellent briefs and able arguments by counsel for the respective parties. The citations of the numerous cases in their briefs indicate the wide diversity of opinion as to the coverage of unemployment compensation statutes in the courts of many of the States, as well as the federal courts, and by administrative authorities. Some of the decisions cited are based on the holding that the statutory provisions are merely declaratory of common law principles as to the relation of master and servant, and others upon variations apparent in the statutes under review. The variations in the statutes reflect the latitude necessarily allowed legislative bodies to work out compensation acts suited to the needs of their jurisdiction. In this connection it must be borne in mind that the Virginia. Act includes individuals who would have been excluded under the common law concepts of master and servant, Code, 1942 (Michie), section 1887(94) (j) (1), and, on the other hand, excludes a great number of persons, domestic servants, agricultural laborers and others who, under common law concepts of master and servant are deemed employees. Code, 1942, section 1887(94) (j) (7).

The questions raised here have been carefully considered and determined by us, contrary to the position taken by the appellants, in four recent cases: *Life, etc., Ins. Co.* v. *Unemployment Compensation Comm.*, 178 Va. 46, 16 S. E. (2d) 357; *Unemployment Compensation Comm.* v. *Harvey*, 179 Va. 202, 18 S. E. (2d) 390; *Unemployment Compensation Comm.* v. *Collins*, 182 Va. 426, 29 S. E. (2d) 388; *Huffman Co.* v. *Unemployment Compensation Comm.*, 184 Va. 727, 36 S. E. (2d) 641.

In the above cases we held that in determining the meaning of the word "employment," as used in the Virginia

Unemployment Compensation Act, "we are bound by the statutory definition of that word (Code, 1942 (Michie), section 1887(94) (j) (1)), rather than by the common law meaning of the master and servant relation," and that it was "the intent of the legislature, as expressed in the language used, to make the Act broader and more inclusive than the ordinary relation of master and servant." 178 Va. at page 57 and 179 Va. at page 213; that the "Act is primarily a public welfare measure and the levying of taxes thereunder is merely incidental to its purpose, which is to assure a measure of security against the hazard of unemployment in our economic life" and "should be liberally construed to effect its beneficent aims." 182 Va. at page 438, and 184 Va. at page 740; that "the judicial trend is to recognize the beneficent purpose" of such acts in borderline cases and to hold the parties bound by them. 179 Va. at page 217, 182 Va. at page 438, and 184 Va. at page 740; and that exemptions in the Act "should be strictly construed against the party asserting such exemption, the rule requiring liberal construction in favor of the taxpayer not being applicable." 184 Va. at page 740.

See also, *Unemployment Compensation Comm. v. National Life Ins. Co.*, 219 N. C. 576, 14 S. E. (2d) 689, where a number of cases dealing with the coverage under unemployment compensation statutes are cited.

With these guiding principles before us, we come to the pertinent provisions of the Unemployment Compensation Act.

Section 2 of the Act (as amended by Acts 1938, chapter 446, page 1004; Acts 1940, chapter 333, page 538; Acts 1942, chapter 317, page 446) reads as follows:

"Section 2. Definitions.—As used in this act, unless the context clearly requires otherwise:

\* \* \* \* \* \*

"(j) (1) 'Employment' means any service performed prior to January first, nineteen hundred and forty, which was employment as defined in this section prior to such

date, and, subject to the other provisions of this subsection, service performed after December thirty-first, nineteen hundred and thirty-nine, including service in interstate commerce, performed for remuneration or under any contract of hire, written or oral, express or implied.

\* \* \* \* \* \*

"(6)  Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless;

"(A)  such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(B)  such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; or such individual, in the performance of such service, is engaged in an independently established trade, occupation, profession or business."

\* \* \* \* \* \*

"(r)  'Wages' means all remuneration payable for personal services, including commissions and bonuses and the cash value of all remuneration payable in any medium other than cash."

It is clear from the contract itself and the evidence of the witnesses that the commission agents and commission truck drivers performed services for appellants for remuneration.  In their brief it is admitted that the services "to be performed are the reasonable protection of the products on consignment and the negotiating and consummating of sales thereof."  The statutory definition of "wages" found in the Act and quoted above includes "commissions and bonuses" paid to a worker.  Code, section 1887 (94) (r).

Appellants contend, however, that it is immaterial whether or not their commission agents and truck drivers are included within the definition of the term "employment,"

in Code, section 1887 (94) (j) (1), because, even if they are, they are excluded therefrom by the saving provisions of section 1887 (94) (j) (6).

The burden of showing such exemption is upon the appellants. *Life, etc., Ins. Co.* v. *Unemployment Compensation Comm., supra,* 178 Va., at page 54; *Huffman Co.* v. *Unemployment Compensation Comm., supra,* 184 Va., at page 740.

To bring its agents under either one of the exemptions in the Act designated as (A) and (B) under Code, section 1887 (94) (j) (6), set forth above, appellants must demonstrate that they have no control or direction over the services of the agents and that the services are either outside the usual course of customary business, or that the services are performed outside of appellants' places of business; or that the agents were "engaged in an independently established trade, occupation, profession or business."

■ The existence of the relation of master and servant under the Unemployment Compensation Act and at common law does not depend upon how the parties designate each other in their contract. At common law the determining factor in the relationship of master and servant is the right of control. In the Unemployment Compensation Act, the provisions of Code, section 1887 (94) (j) (6) furnish us the guide in determining whether the Act should be applied in a given situation. Under the Act, services performed by an individual for remuneration shall be deemed to be "employment" unless (A) such individual is free from control, both under his contract and in fact, and his service comes within one of the conditions in subsection (B). Two conditions must be met, (A) freedom from control and at least one of the conditions in (B).

As to what constitutes the power of control, the case of *Texas Co.* v. *Zeigler,* 177 Va. 557, 564, 14 S. E. (2d) 704, is directly in point. There the Texas Company had a contract with a commission agent, which contract was substantially the same as the one here involved, with the

differences hereinafter set out. A truck driver of the commission agent, while driving the truck of the agent, negligently struck an automobile, injuring a number of persons. The action was in tort, and the question was whether the commission agent was an independent contractor with The Texas Company, or whether the relationship of master and servant existed between them. We held, in construing the contract, that the agent and his driver were in the employment of The Texas Company.

Comparing appellants' contract with the Texas contract, we find that the former creates a closer relationship of master and servant than did the Texas contract. Articles 6-8-10-11-17-22 and 23, hereinabove set out in appellants' contract, are not in that of Texas. In the Texas contract, there was a provision forbidding the agent, after a termination of his contract, from engaging in a business of like character within fifty miles of Richlands, Virginia, for a period of five years. There is no such provision in appellants' contract, but its omission is immaterial since it is the control or power of control that exists during the period of service of the agent under the contract that provides the test.

Appellants do business in Virginia in their own names and under licenses acquired in their names. They do not sell to their agents and truck drivers any of their products. The agents and truck drivers sell appellants' goods, a service that is essential in the distribution of the products. Appellants own or lease all of the real estate on which their distributing plants are located, as well as the buildings and tanks situated thereon. The plants bear their names. Their commission agents conduct the wholesale distribution from the plants. Appellants retain title to all of their products at their plants until they are sold by their agents, and their agents are required to account for such sales at regular intervals by inventory reports. The agents make both cash and credit sales in the name of Sinclair or Sherwood as the case may be. Receipts for payments are signed in

the name of the corporation by the agent. All collections must be deposited daily by the agent in a local bank designated by the corporation, in the name of the corporation, and commissions are thereafter remitted to the agents at regular intervals. The agents are without the right to sell to customers on credit without first obtaining the corporation's approval. They must confine their operations within a limited territory. They are required to place the name of the corporation in large letters upon their trucks. Appellants fix the sale prices of their products, and if sales are made at lower prices than those fixed by them, the difference is withdrawn from the amount of the agent's commission, and if sales are made on credit without their approval, the charge is made against the agent. Appellants pay half of the expenses of advertising. They have the right to examine their agents' books, inspect their operations and methods of doing business, and to keep the operation of their agents under the supervision of field representatives. The agent must provide and list a telephone in the name of the corporation he works for.

The commission agent is allowed some freedom with regard to purchasing and operating trucks, the hiring of help, and fixing the wages and hours of work of helpers; but this does not lessen the control maintained over the agent in the handling of the property of appellants. The agent has no right to assign his contract or the business conducted thereunder. His contract may be cancelled with or without cause and without notice. It is true agents are not required to give all of their time to the business of selling appellants' products; but they must operate that business in such a way as to meet the approval of appellants. They are engaged in distributing appellants' products and assisting in the operation of the latter's business according to the standards and methods of appellants.

With respect to the first two conditions of exemption (B), Code, section 1887(94) (j) (6), it seems clear that the services performed by the agents and truck drivers are

within the usual course of the oil distributing business of the appellants. As we have stated, the evidence shows that appellants do not sell their products to their agents and truck drivers. They sell them to retail distributors, or to consumers, by means of the service of such agents and truck drivers, an essential operation in the conduct of their business.

As to whether the services are performed by the agents outside of all the places of business of appellants, the record shows that appellants own the plants from which the business is done, hold the license for such business, and control both the plant and the operations thereon and therefrom. The services of the agents are also in part performed at the plant.

The finding of the Commission that the helpers of the agents and truck drivers are in the employ of appellants is in accordance with Code, 1942 (Michie), section 1887(94) (h).

No amount of argument can overcome the realities of the situation. Consideration is required not only as to what is done under the contract, but what may be done thereunder. It is evident that the potentialities of direction and control are present as well as the actualities. It is difficult for us to conceive how, under the conditions enumerated in the contract, the commission agents and truck drivers can be said to be free from direction or control in the performance of their specified services. Their contract requires obedience to the business methods prescribed by appellants, and puts them under a complete system of restraint and control, a control constant during its life.

The findings of the Commission are amply supported by the evidence. They are conclusive and we are bound by them. Code, 1942 (Michie), section 1887(98) (h). For the reasons stated, we are of opinion that the decree of the trial court affirming the decision of the Commission should be affirmed.

*Affirmed.*