## Richmond

VIRGINIA EMPLOYMENT COMMISSION

v.

## A. I. M. CORPORATION

April 29, 1983.

Record No. 801516.

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, and Russell, JJ., and
Harrison, Retired Justice.

*Robert J. Barry, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellant.

*Linda L. Royster (Charles F. Witthoefft; Hirschler, Fleischer, Weinberg, Cox & Allen,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this case arising under the Virginia Unemployment Compensation Act, Code §§ 60.1-1 through -134, we consider whether services performed by certain individuals for remuneration constitute "employment" subject to the Act.

In 1979, appellant Virginia Employment Commission initiated a proceeding pursuant to Code § 60.1-70 to determine whether some of the activities in connection with the business of appellee A. I. M. Corporation, a company engaged in the distribution of "Mrs. Smith's Pies" products, amounted to "employment" under the Act. After a hearing, a special examiner designated by the Commission ruled that the services performed by "owner-operators" of A. I. M. constitute such employment. Accordingly, in a decision reciting findings of fact, the Commission ordered A. I. M. to file payroll contribution reports as required by the Act and Commission regulations, covering remuneration paid to those employees for the years 1976, 1978, and 1979 and thereafter as long as A. I. M. is liable under the Act.

A. I. M. filed a petition for judicial review in the court below pursuant to Code § 60.1-71. After consideration of the pleadings, the record of proceedings before the Commission, and argument of counsel, the trial court set aside and vacated the Commission's decision, ruling the relationship between the owner-operators and A. I. M. did not constitute employment under the applicable provisions of the Act. This appeal by the Commission ensued, following entry of the June 1980 final decree.

Under Code § 60.1-71, "the findings of the Commission as to the facts, if supported by the evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the [trial] court shall be confined to questions of law." Here, the pertinent facts are undisputed and there is no claim of fraud. The record before the Commission is comprised of a specimen copy of a seven-page written agreement between A. I. M. and the owner-operators, the testimony of two witnesses, and several other exhibits. Thus, our task is to determine whether the trial court committed an error of law in setting aside the Commission's decision.*

Since 1975, A. I. M. has been a distributor for "Mrs. Smith's Pies" products in the Richmond metropolitan area. The merchandise is purchased at a distribution point in Maryland and delivered daily to A. I. M.'s Henrico County facility. In order to distribute the products locally, A. I. M. enters into contracts with individuals, called "owner-operators," who purchase the products from A. I. M. and resell them to customers.

The contract, labelled "Owner-Operator License Agreement," and the method of operation may be summarized as follows: A. I. M., the "company," grants the owner-operator a "license" to sell all types of the company's pies in a described "geographic area of prime responsibility." The individual agrees "to fully and adequately service such territory in a manner that could be reasonably expected to obtain the maximum number of sales" of the company's products.

---

* A. I. M. moves to dismiss this appeal. It contends the Commission lacks standing to seek review of the order below because it is not a person "aggrieved" within the meaning of Code § 8.01-670. There is no merit to this contention. Given the nature of the instant proceeding under chapter 5 of the Act, we believe Code § 60.1-71 implicitly recognizes the Commission's standing as an aggrieved party because it provides without qualification that in the appeal before this Court, "the Commission shall be represented by the Attorney General."

The owner-operator promises to purchase from the company the quantities of products he determines are necessary to maintain "a sufficient distribution in the Territory." He agrees "to maintain route books showing the name and address and the amounts sold to each customer so that a permanent record can be made of the customers within the territory." Such record is to be delivered to the company upon termination of the agreement. According to the contract, the individual may add customers at any time, terminate service to customers in his sole discretion, and may sell to customers outside the geographic area of prime responsibility.

The owner-operator is required to "maintain telephone service at his place of residence so that he can communicate, or be communicated with, on any special problems." He promises to work a minimum of six days per week, although, in practice, this provision is not strictly enforced. The agreement contemplates "active engagement by the Owner-Operator in his own business of distributing and selling Company's products." The individual may conduct whatever other business activities he wishes, however, except he may not distribute products within the territory that compete with Mrs. Smith's Pies products.

The individual agrees "to purchase or lease and equip a truck with racks and shelves" suitable for delivery of the products "in a business like manner." He promises to maintain liability insurance on the vehicle and to have painted on the truck's front doors "Owned and Operated by" followed by the individual's name and address. He is permitted to "utilize his truck equipment as he deems fit" provided the use does not violate any terms of the contract. He promises to obtain, at his expense, any licenses and permits required by law for the equipment, to pay any taxes or fees assessed in respect to the equipment, and "to pay all the expenses of his business operations." He is permitted to use "a company owned spare vehicle" for three days each calendar quarter.

The owner-operator agrees to pay cash on the day of receipt for products purchased. Testimony showed that the individuals return to A. I. M.'s Henrico County facility each evening "to settle" with the company. Balances owed to or by the owner-operator are carried over in some instances from day to day with settlement of each account required by Friday of each week.

The individual promises not to distribute "day-old Soft Pies" and the company declines to "accept responsibility" for products which have become adulterated by the "Owner-Operator's mis-

handling." The company agrees to "accept responsibility" for adulterations resulting from the manufacturing process.

The owner-operator may employ others "in the conduct of his business" and promises "to service the territory with a competent, experienced and qualified Driver-Salesman" who shall be under the sole control of the owner-operator. The payment of all amounts due for taxes or charges (unemployment, social security, workmen's compensation, withholding) upon such employees is the responsibility of the owner-operator.

The individual covenants not to compete with the company in the territory for a period of six months from termination of the agreement. He agrees that if he becomes "involved in a labor dispute" which interferes with the individual's activity for the company, the contract is subject to "immediate cancellation by the company without liability of any kind whatsoever."

According to an affidavit submitted at the hearing by A. I. M.'s president, corroborated by his testimony, the owner-operator "receives no payment for services from A. I. M." Although the written contract provides the company "agrees to pay the Owner-Operator for services rendered to the company," an attachment to the contract interprets this provision solely as requiring the company to allow the individual a percentage discount off the posted wholesale price of company products upon sale to the owner-operator. According to the affidavit, the products so purchased from the company may be sold by the individual to his customers at a price determined solely in his discretion. The profit, if any, to the individual is the result of the owner-operator's ability to sell his products at a premium over the price paid, while minimizing the expense of his business enterprise.

The contract states the relationship of the individual to the company "shall be that of independent contractor." It provides the agreement may be cancelled after the first 30 days upon either party receiving 15 days written notice from the other. It further recites the owner-operator may assign or sell his rights under the contract, subject to prior written approval of the company and provided the assignee or purchaser agrees to enter into a new agreement under the same terms and conditions as set forth in the present contract.

During the administrative hearing, the Commission's field tax representative offered an an exhibit a September 25, 1978 letter of A. I. M.'s president, Arnold I. Meyer. The letter was written to

Patricia Knapp, one of the owner-operators, who was subsequently discharged and applied to the Commission for unemployment compensation. Meyer testified he had been "with her" during the week before the letter was written and "the lady asked for my comments on how she conducted her business on her route." The letter reads:

"Dear Pat:

"You have asked for my comments on your route.

"1. The deluxe boxed pies you put out on Tuesday, 9-19-78, should have been picked up on Friday, 9-23-78. These pies also should have a pull date on them, of no more than 3 days for fruit and 2 days for custard and meringue. Let's change this practice this week.

"2. When you over-charge a chain account like Big Star, we all get hurt, because when you get caught, we get put out of the store and possibly out of the company operation. This has happened already. Remember, Mrs. Smith Pie Co. is Coast to Coast.

"3. You will be able to serve the STOPS I gave you on Tuesday and Thursday or Friday, by working route 30, this side of 360, with a little extra driving. Give it a chance to develop.

"4. Your truck is in need of repair. Like a new muffler (which you have already) and repair or replace the magnets on the pie cabinets. If you would like, I will LOAN you a new cabinet for your truck and YOU at your own expense get it put in.

"5. I want from you, no later than Thursday September 28, 1978, a complete and up to date, including the stops I added, Route List of your area, listing the items put in each stop, whether it be deluxe, mellowrich, pastry or whatever.

"6. I think that if you would start to work before 6 A.M., you could handle more business and complete your job. Your job is not finished until you have returned to the warehouse and checked in.

"This letter may be taken as a warning. I have done for you, now do for me."

Having examined the relationship of the parties as demonstrated by the facts, we now turn to the applicable law. The

meaning of "employment" in the unemployment compensation context is controlled by statute. The Act is essentially a public welfare measure and the levying of taxes on the employer is merely incidental to its purpose, "which is to assure a measure of security against the hazard of unemployment in our economic life." *Unemployment Compensation Commission* v. *Collins,* 182 Va. 426, 438, 29 S.E.2d 388, 393 (1944). The Act is to be liberally construed to effect its beneficent purpose and in borderline cases "employment" should be found to exist. *Id.* Exemptions in the Act should be strictly construed against the alleged employer, the rule requiring liberal construction in favor of the taxpayer not being applicable. *Huffman Co.* v. *Unemployment Compensation Commission,* 184 Va. 727, 740, 36 S.E.2d 641, 646 (1946). As defined in the Act, the term "employment" should be accorded a broader and more inclusive meaning than in the common-law context of master and servant. *Life & Casualty Co.* v. *Unemployment Compensation Commission,* 178 Va. 46, 57, 16 S.E.2d 357, 361 (1941).

As pertinent here, "employment" generally means any service performed for remuneration or under any contract of hire, written or oral. Code § 60.1-14(1)(a). The section specifically provides in subsection (6) that:

"Services performed by an individual for remuneration shall be deemed to be employment subject to this title unless:

(a) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

(b) Such service is either outside the usual course of the business for which such service is performed, or such service is performed outside of all the places of business of the enterprise for which such service is performed; or such individual, in the performance of such service, is engaged in an independently established trade, occupation, profession or business."

Thus, the services individuals perform for remuneration under a contract for hire are deemed "employment" unless they are exempt under both (a) and (b) above. And the burden is on the putative employer to establish by a preponderance of the evidence that it is within the statutory exemptions. 178 Va. at 57, 16 S.E.2d at 361.

■ The dispositive question in this case arises from subsection (a) of § 60.1-14(6); it is whether the trial court correctly decided A. I. M. established by a preponderance of the evidence that its owner-operators have been and will continue to be free from control over the performance of their services, both under the agreement and in fact.

As at common law, and in the worker's compensation context, the existence of the master-servant relationship under the unemployment Act "does not depend upon how the parties designate each other in their contract." *Sinclair Refining Co.* v. *Unemployment Compensation Commission,* 189 Va. 692, 708, 54 S.E.2d 72, 80 (1949). *See Richmond Newspapers Inc.* v. *Gill,* 224 Va. 92, 98-99, 294 S.E.2d 840, 843-44 (1982). Rather, the individual's status in relation to the alleged employer is to be determined from all the facts and circumstances adduced by the evidence, including the provisions of any written agreement.

■ In any master-servant analysis, be it in the area of tort liability, worker's compensation, or unemployment compensation, the power of control is the determining factor in ascertaining the parties' status. The potential power of control, not the actual exercise of control, is the important element. *Texas Company* v. *Zeigler,* 177 Va. 557, 14 S.E.2d 704 (1941). And the right of control does not include only the power to specify the result to be accomplished, but, in the language of the Act, it must include the power over the "performance of such services, both under [the] contract of service and in fact." § 60.1-14(6)(a). If the party for whom the work is to be done has the power to direct the means and methods by which the other does the work, an employer-employee relationship exists; if the latter is free to adopt such means and methods as he chooses to accomplish the result, he is not an employee but an independent contractor. *Gill,* 224 Va. at 98, 294 S.E.2d at 843. Among the tests used to determine if the right to control exists are: whether instructions have to be obeyed, and whether either of the parties possesses the right to terminate services at will without incurring liability to the other. *Zeigler,* 177 Va. at 565, 567, 14 S.E.2d at 707, 708.

■ Both parties rely on *Sinclair Refining Company, supra,* and claim it factually supports their respective positions on the question of control. There, this Court decided delivery truck drivers performing services under contract with Sinclair, a petroleum

distributor, were entitled to unemployment compensation coverage as employees and that they were not independent contractors.

The Attorney General lists similarities between *Sinclair* and this case: Sinclair and A. I. M. are distributors of products; both employ delivery truck drivers under a contract of hire to deliver products to retail outlets; Sinclair and A. I. M. drivers pay all expenses incident to delivery; Sinclair and A. I. M. drivers operate in designated geographical areas; both companies require hold-harmless agreements of the drivers; Sinclair and A. I. M. drivers must insure those who assist on their delivery routes; Sinclair and A. I. M. drivers are required to maintain telephone service for the employer's convenience; Sinclair and A. I. M. drivers cannot assign their contracts without prior permission; and termination without cause is possible without resulting liability.

A. I. M., on the other hand, observes the *Sinclair* Court noted several factors in support of the conclusion that the individuals in question were employees of the oil distributor, "none of which factors are present in the relationship between A. I. M. and the Owner-Operators." For example, A. I. M. says, the Court noted that the oil distributor did not sell its products to the truck drivers; cash and credit sales were made in the name of the oil distributor, not the driver, and receipts were signed in the distributor's name by the driver; the oil distributor, not the driver, fixed the sales price of the product sold; the drivers were required to pay one-half of the advertising expenses incurred by the distributor; and the drivers were required to have a telephone listed in the distributor's name. Given these crucial distinctions from *Sinclair,* A. I. M. argues, the trial court correctly recognized the owner-operators were free from A. I. M.'s control in selling bakery products to their customers. We do not agree.

Careful scrutiny of the contract and other evidence in this case convinces us that A. I. M. has failed to prove that the owner-operators are free from the company's control and direction in the performance of their service of distributing the products in issue. Indeed, the evidence demonstrates A. I. M.'s potential power of control, and an actual exercise of that control in the case of Patricia Knapp.

Potentially, A. I. M. has the right to discharge without cause any owner-operator without incurring any liability to the individual. In this contract, which has no fixed term, the cancellation provision, reasonably construed, provides that within the first 30

days, discharge without cause may be accomplished without notice; thereafter termination without cause may be upon a 15-day notice. The language of the provision is: "This Agreement may be cancelled at any time after the first thirty (30) days upon either party receiving fifteen (15) days written notice from the other." And an examination of the agreement as a whole does not require a different construction of the termination provision. Such provisions are consistent with the existence of an employer-employee relationship, *Gill,* 224 Va. at 100, 294 S.E.2d at 844, and A. I. M. has failed to prove otherwise.

More important, however, is the conduct demonstrated by the Knapp letter. That document is more revealing upon the real relationship of the parties than the professionally drawn contract and the carefully worded affidavit, with appropriate legalese, of A. I. M.'s president.

Meyer's "comments" in the letter show the actual exercise of control over the performance of the daily duties of an owner-operator in Knapp's position. In paragraph 1, the details of date-marking and the timing for recovery of the perishable goods are outlined. In paragraph 2, the fixing of Knapp's profit margin is under close scrutiny. In paragraph 4, the need for vehicle and equipment maintenance is specified. In paragraph 5, there is close supervision of the manner of compiling the information in the route books; a deadline for compliance is fixed. In paragraph 6, control is exercised over the hours of work. And, finally, the letter is labelled a "warning" and the employer says: "I have done for you, now [you] do for me." When asked about the meaning of the "warning," Meyer testified it related to "termination of her contract and arrangements with me." Moreover, the letter shows, in many instances, the sharp inconsistencies as to control between the actual practice and that apparently contemplated by the theoretical contract.

A. I. M.'s reliance on the *Gill* case, *supra,* is misplaced. There, a newspaper route carrier was held to be an independent contractor and not an employee. But in that worker's compensation case with similar facts, the statute that governs here, providing the employee must be "free from control," was not, of course, involved. In addition, the degree of control exercised by Richmond Newspapers over Gill was much less than A. I. M. exerted over Knapp. For example, in contrast to the Knapp situation, the newspaper did not interfere with Gill's hours of work, did not specify the

manner in which Gill was to serve his customers, and did not monitor the condition of the equipment used in the delivery operation.

In summary, under this evidence, as in *Sinclair,* it cannot be said that the delivery persons are "free from direction or control in the performance of their specified services"; the "contract requires obedience to the business methods prescribed" by A. I. M. and places the owner-operators "under a complete system of restraint and control, a control constant during" the life of the agreement. 189 Va. at 711, 54 S.E.2d at 81.

In conclusion, A. I. M. contends no "wages" within contemplation of the Act are paid the owner-operators, and, thus, it has no potential liability for unemployment taxes. It says that because no money actually is transferred by A. I. M. to the owner-operators, there is no basis upon which to apply any percentage to determine the amount of tax owed. *See* Code § 60.1-72. We reject that contention. The term "wages" is broadly defined in Code § 60.1-26. As pertinent here, the statute provides that: " 'Wages' means all remuneration payable for personal services, including . . . any payments made by an employer to an employee . . . and the cash value of all remuneration payable in any medium other than cash." The manner in which the remuneration is achieved is never controlling. *Unemployment Compensation Commission* v. *Harvey,* 179 Va. 202, 215, 18 S.E.2d 390, 396 (1942). Here, the owner-operator obtained the goods from A. I. M at a percentage discount of the wholesale price of the company's products. If we assume a 20 per cent discount, the remuneration to the owner-operator would be at least an amount equalling that percentage of "the posted wholesale price of Company products," in the language of the contract. Manifestly, while the employees may not have been paid cash in hand, they nevertheless were "paid" within the meaning of § 60.1-26.

For these reasons, the judgment of the trial court will be reversed, the Commission's decision in this matter dated December 18, 1979 will be reinstated, and final judgment will be entered here in favor of the Commission.

*Reversed and final judgment.*