(Nos. 37057 and 37058.—
J. R. SPAIIN *et al.*, Appellees, *vs.* THE DEPARTMENT OF LABOR *et al.*, Appellants.—(PARK FOREST CONSERVATORY, INC., Appellee, *vs.* SAME Appellants.)

*Opinion filed September 28, 1962.*

WILLIAM G. CLARK, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, A. ZOLA GROVES, and AUBREY KAPLAN, Assistant Attorneys General, of counsel,) for appellants.

SOL JAFFE, of Chicago, for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

The question involved in these proceedings is whether certain dancing teachers and music instructors, engaged by Tempo School of Dance and Park Forest Conservatory,

Inc., respectively, are employees within the terms of the Unemployment Compensation Act so as to require the payment of employer's contributions thereunder by the dance and music schools. In separate actions brought by the alleged employers to contest the assessment of such contributions, the Director of Labor in each instance held in the affirmative but, upon administrative review, the circuit court of Cook County reversed the determinations, and appeals to this court have been prosecuted by the Department of Labor and its Director. Since the facts and issues presented are similar the cases have been consolidated for the purposes of this opinion.

Park Forest Conservatory, Inc., is a business corporation organized in 1955 to operate a music school in Park Forest, and its owners were J. R. Spahn and W. J. Hoel, and their respective spouses. Spahn was vice-president in charge of operations and his wife, who was the secretary, ran the business office, maintained a record of the teacher's schedule, assigned studio space to the various instructors, received the teacher's written report as to lessons given, billed the students and collected the tuition, paid the teachers each month, and talked with parents concerning the music instruction to be given their children, the lesson price, time schedule, and particular instructor desired. If the parent had no particular teacher in mind, the secretary would make the assignment herself and notify the teacher accordingly. Of the fees collected from the students, two thirds was paid to the instructor furnishing the lesson and one-third was retained by the corporation.

The music instructors, ranging from twenty to thirty in number, were mostly public school teachers or professional musicians and some gave private lessons at home to persons not enrolled at the Conservatory. A prospective teacher was generally contacted by W. J. Hoel or Mrs. Spahn and asked to come to the Conservatory for an interview at which time the proposed teaching arrangement

and lesson prices were explained. If that particular individual desired to teach at the Conservatory, he was then asked to sign a written contract with the corporation, entitled "Contract Agreement For Teachers," which provided that the individual was "to act in the capacity of instructor" and to perform such duties "in an efficient and conscientious manner." By its terms, the corporation was to furnish a studio to the instructor and was to receive as rental therefor one-third of the tuition fees received from the students taught at the Conservatory. The agreement also bound the corporation to "utilize its efforts" in furnishing students and bound the instructor not to engage in other private musical instruction within ten miles of the Conservatory. The corporation could terminate the contract only because of the instructor's "incompetence, inefficiency, dishonesty or irresponsibility," and the teachers agreed to "comply to all policies and regulations as may be from time to time" made by the corporation. In the event an instructor severed his connection with the Conservatory, the contract provided that "then the students shall be and remain the students" of the corporation. A teacher could fix his own hours, refuse a particular student, and discontinue teaching at the Conservatory upon giving a 30-day notice. There were no regular recitals, no prescribed course of study, and no required progress report. In the event an instructor was ill and could not attend a lesson, he would contact the school secretary and ask her to make other arrangements with the pupil. Those teaching at the Conservatory were required by the corporation to keep their studio doors and windows closed, be prompt for lessons, and maintain a desirable decorum, but, according to the testimony of W. J. Hoel, the ultimate responsibility for maintaining the school's high standards rested with the corporation. He reiterated, however, that if the teachers wanted something that was reasonable, the corporation would "go along with it." Although it appears that the minimum les-

son charges were uniform and could be changed only with the unanimous consent of all the teachers, a few instructors did upon occasion charge larger sums after discussing the matter with the corporation owners.

Sometime after the music school was organized, it developed that the building was not being utilized to its capacity, so J. R. Spahn and W. J. Hoel, the corporation owners, formed a partnership to operate for profit another business known as the Tempo School of Dance. The partnership subleased space from Park Forest Conservatory, Inc., Spahn managed the dancing school, and Mrs. Hoel advertised for students in the name of the partnership, received student applications and tuition money, billed the students if necessary, paid the teachers each month, and discussed with the parents their teacher preference. If there was no request for a particular instructor, Mrs. Hoel would assign the student to the teacher then available.

The dance instructors, being three in number, were initially interviewed by Spahn and Mrs. Hoel, at which time the lesson prices were discussed and agreed upon. Each teacher was then required to sign a written contract identical, except for name, with the ones used by the Conservatory. The instructors were required to be on time for their classes, to turn in to Mrs. Hoel a monthly report of class attendance, and to secure permission before changing the time or place of scheduled lessons. The teachers could refuse a student, but as a fact never did so, and they were free to develop their own course of study. Of the lesson fees collected, two thirds were paid to the instructor furnishing the lesson and the remaining one-third was retained by the partnership.

In determining whether an employment relationship exists, the common-law concepts of master and servant are not controlling but one must look to the somewhat broader statutory definition. (*Parks Cab Co.* v. *Annunzio,* 412 Ill. 549.) Section 206 of the Unemployment Com-

pensation Act (Ill. Rev. Stat. 1955, chap. 48, par. 316) defines "employment" as "any service * * * performed by an individual for an employing unit," and section 212 (Ill. Rev. Stat. 1955, chap. 48, par. 322) provides that service performed by an individual for an employing unit, whether or not such individual employs others in connection with the performance of such services, shall be deemed to be employment unless it is proven (1) that such individual is free from control over the performance of such services, both under his contract and in fact, (2) that such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed, and (3) that such individual is engaged in an independently established trade, occupation, profession, or business. It should be noted that these conditions are conjunctive, and that if an individual performs services for an employing unit, he is an employee under the act unless the party can prove all three of these requirements. *Ross* v. *Cummins*, 7 Ill.2d 595; *Miller, Inc.* v. *Murphy*, 379 Ill. 524.

In the present cases, the appellees contend they were organized solely for the purpose of leasing space to the various instructors, who were therefore tenants rather than employees. However, the facts indicate otherwise. It appears that both Park Forest Conservatory, Inc., and Tempo School of Dance were formed to engage in the giving of music and dancing lessons to the general public for profit. The latter, through newspaper advertisements, held itself out as a school of dance and by answering the initial inquiries, receiving the student applications, assigning the students to a particular instructor, specifying the time for such instruction, notifying the students of changes therein, and rendering statements for lessons received, maintained the contact with the individual pupil and his parents, whereas the instructors' contact was limited to classroom

teaching. The agreement to furnish lessons was therefore between the student and the school, rather than with the individual instructor, and this responsibility of the school to the student was recognized not only in the care which appellees took in interviewing prospective teachers, insisting upon promptness upon the part of the teachers, maintaining certain rules of decorum, and in a uniform minimum lesson price, but was also emphasized by the testimony of W. J. Hoel that the ultimate responsibility for maintaining the Conservatory's high standards rested with the corporation. The contract which each teacher signed specifically provided that he was to act as an instructor, perform his duties in an efficient manner upon penalty of contract termination, and comply with all school regulations, and that in the event he severed his connection with the school, the students were and should remain the pupils of the school. These are not usual lease provisions. We think it is clear that the teachers performed services for appellees in rendering instruction which the school had by separate oral contracts agreed to give the students. It remains to be decided whether appellees have proved the three conditions necessary to relieve them from the obligations of an employer.

We have consistently held that the existence of general control, or of the right to general control, even if not actually exercised, is sufficient to prevent the proving of the statutory exception even though the details of the service are left to individual judgment. (*Myers* v. *Cummins,* 9 Ill.2d 582; *Stauffer Reducing, Inc.* v. *Cummins,* 23 Ill.2d 567.) Here, as a practical matter, the instructors taught students that were assigned to them in studios that were also assigned to them by appellees, received compensation based upon lesson prices fixed by prior agreement with the schools, rendered monthly attendance reports to the secretary, complied with various school regulations, and were subject to termination of contract by appellees for incompe-

tence, inefficiency, dishonesty, or irresponsibility. Although the instructor was free to initially set his teaching schedule with the school, he was thereafter expected to adhere to such schedule except for good cause, and his freedom to develop the course of study is neither unusual nor conclusive when dealing with the performance of professional or artistic services. (*Miller, Inc.* v. *Murphy,* 379 Ill. 524.) The instructors were not in our opinion free from appellees' control.

Neither was the instruction performed outside the appellees' usual course of business or place of business. Rather, it seems clear that appellees' businesses were the operation of music and dancing schools, which included the giving of instruction rendered by these particular teachers, and that all of the instruction in question was performed at the Conservatory building.

It is apparent that in order to qualify under the third condition set forth for exemption under section 212, namely, the operation of an independent trade or business, the individual performing the service must have had a proprietary interest in such business to the extent of being able to operate the same without hindrance from any other person and of being the owner of an enterprise which he could sell or give away. (*Murphy* v. *Daumit,* 387 Ill. 406.) Although in the present case some of the music instructors were independently employed as public school teachers or professional musicians, it appears that all the instructors were largely dependent upon appellees for the furnishing of private students and that their continued association with the schools in question depended upon the performance of their instruction to the satisfaction of the appellees. We cannot, therefore, say that the condition of independent enterprise has been proved in the present instance.

Since the appellees have relied heavily upon *Wallace* v. *Annunzio,* 411 Ill. 172, it is appropriate that we should dif-

ferentiate that case from the facts at hand. The *Wallace* case involved the question of whether associate attorneys of a law firm, who handled certain cases for the firm under a fee-sharing arrangement, were actually employees. In deciding in the negative, we pointed out that by reason of their sharing the cost of office rent, secretarial salaries, and other expenses, and assuming the independent responsibility for cases which were referred to them, the relationship between the associates and the firm was one of partnership or joint venture, and that even if the performance of a service were presumed, the work was performed by the associates in their own offices, without supervision or control, and in conjunction with the private practice which each associate maintained with his own clients so as to meet the conditions for exemption specified in section 212 of the Unemployment Compensation Act. In the present case, there was no showing that the instructors were to pay their proportionate share of expenses irrespective of fees received or that they participated in the operation of the schools so as to constitute a joint venture or partnership arrangement. Neither were the conditions of exemption present as we have heretofore indicated.

Findings of fact of the Director of Labor are *prima facie* correct and should not be disturbed unless contrary to the weight of the evidence. (*Myers v. Cummins,* 9 Ill.2d 582; *Greenberg v. Industrial Com.* 23 Ill.2d 106.) After careful consideration of these records, we are of the opinion that the lower court erred in reversing the administrative decision in each of these cases. The judgments of the circuit court of Cook County are, therefore, reversed and the decision of the Director of Labor in each of these proceedings is confirmed and the assessments reinstated.

*Judgments reversed and decisions of Director of Labor confirmed.*