## Norfolk

VIRGINIA EMPLOYMENT COMMISSION

v.

PENINSULA EMERGENCY PHYSICIANS, INC.

No. 0991-86

Decided August 18, 1987

COUNSEL

Stephen Chapple, Assistant Attorney General (Mary Sue Terry, Attorney General; C. Tabor Cronk, Assistant Attorney General, on brief), for the Commonwealth.

Douglas W. McCartney (Conway W. Smith, III, and West, Stein, West and Smith, on brief), for appellee.

OPINION

**HODGES, J.** — The issue in this appeal is whether the trial court improperly reversed a decision by the Virginia Employment Commission (the Commission) finding Peninsula Emergency Physicians, Inc. (P.E.P.) liable for unemployment taxes on remuneration paid to doctors under contract with P.E.P. The Commission contends the only question before the trial court was whether

there was credible evidence from which the Commission could determine that P.E.P. was an "employer" within the statutory definition. The Commission notes that, while it had the initial burden of proving that doctors under contract to P.E.P. were remunerated for the services rendered, the burden then shifted to P.E.P. to prove by a preponderance of the evidence that it qualified for an exemption under Code § 60.1-14(6).[1] The Commission argues that its determination that P.E.P. failed to prove it was qualified for an exemption was supported by the evidence and should not have been reversed by the circuit court.

The Commission and P.E.P. stipulated that the doctors under contract performed services for P.E.P. for remuneration. After presentation of the stipulation, Dr. William Hunter testified on behalf of P.E.P. that approximately thirty doctors were under contract to P.E.P., some of whom worked full time and some part time. The contract between P.E.P. and the doctors required the doctors to provide emergency medical services at Hampton General Hospital and Hampton Outpatient Emergency. In turn, P.E.P. had a contract with those establishments to insure that doctors were available twenty-four hours a day to provide emergency room services.

Hunter testified that P.E.P. was established in 1978 to provide emergency room medical services to Hampton General Hospital and Hampton Outpatient Emergency (H.O.P.E.). Prior to the establishment of P.E.P., the hospital contracted individually with several physicians to provide emergency services. When the number of doctors required to provide services continued to grow, the doctors involved incorporated P.E.P. so that the contract between the doctors providing the services and the hospital facilities did not have to be amended each time a doctor began or ceased working at the emergency facilities. Instead, the new contract was be-

---

[1] Former Code § 60.1-14(6) was reenacted effective January 1, 1987, as Code § 60.2-212(c). The law in effect at the time of this action provided: Services performed by an individual for remuneration shall be deemed to be employment subject to this title unless:

(a) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

(b) Such service is either outside the usual course of business for which such service is performed, or such service is performed outside of all the places of business of the enterprise for which such service is performed; or such individual, in the performance of such service, is engaged in an independently established trade, occupation, profession or business.

tween P.E.P. and the hospital rather than the hospital and the individual physicians. All of the physicians' contractual duties to P.E.P. were performed on the premises of the hospital or the outpatient facility.

Hunter characterized P.E.P.'s business as primarily a billing and collection service for the doctors and noted that P.E.P. paid unemployment tax for its administrative staff. He testified that the contracting doctors were always dealt with as if they were independent contractors. The doctors were responsible for paying social security taxes, income taxes, business license taxes, professional dues, and other fees. In addition, the doctors contracting with P.E.P. had an obligation to hold P.E.P. harmless for any malpractice claims filed against them.

The full time doctors determined their work schedules while the part time doctors had one of their own coordinate their assigned hours. The terms of the contract between the full time doctors and P.E.P. required them to give between sixty and 120 days notice of termination; the part time doctors were not required to comply with this provision. As to the method of determining how much each doctor was to be paid, Dr. Hunter testified:

> [M]ost of the physicians are paid on an hourly wage or annual salary basis and the reason for that is that . . . P.E.P. sends out bills for approximately 50,000 patients a year and . . . it would be very awkward for a physician to see a patient and then for P.E.P. to follow what was charged to that patient and then recovered from the patient . . . and then reimbursed to the physician, minus expenses. So . . . for what P.E.P. thinks is good business judgment, minimize (sic) the expenses, it's (sic), the expenses are levied, across the board, to all physicians and an hourly wage determined or an annual salary determined and paid to the physicians.

Expenses such as malpractice insurance and bad debts were factors used when wages were determined. All part time doctors were paid by the hour; while some of the full time doctors were paid an annual salary, some were paid an hourly wage, albeit a greater wage than the part time doctors were paid. Although P.E.P. did not have a governing board, its shareholders deter-

mined the amount paid to each of the contracting doctors depending upon their experience and skill. Excess funds left after payment of salaries and expenses went to the full time doctors who were shareholders. Not all of the doctors under contract were shareholders. It is not clear from the record whether all full time doctors were shareholders or whether only those full time doctors on annual salary were shareholders.

The doctors were all covered by a blanket medical malpractice insurance policy because:

> [T]here was concern by Peninsula Emergency Physicians, with litigious society, we did not feel comfortable in trusting that every physician would have adequate insurance because, in the case of a suit, the individual physician would be the primary responsible individual sued and, within the shotgun approach, the Peninsula Emergency Physicians may be sued also.

The Commission found P.E.P. had presented sufficient evidence to show the corporation did not control the performance of the services the doctors provided, but held P.E.P. had not established the services were outside the usual course of business or that the physicians were engaged in an independently established trade, occupation, profession or business.

P.E.P. concedes that the only question before the Circuit Court of the City of Richmond was whether the evidence before the Commission was sufficient to show that the doctors under contract to P.E.P. were engaged in an "independently established . . . profession." Therefore, the dispositive question is whether the corporation presented sufficient evidence to carry its burden of proof under former Code § 60.1-14(6)(b), which read in pertinent part:

> (6) Services performed by an individual for remuneration shall be deemed to be employment subject to this title unless:

> * * *

> (b) [S]uch individual, in the performance of such service, is engaged in an independently established trade, occupation, profession or business.

The standard of review on appeal is set out in former Code § 60.1-71, which provided in pertinent part:

> [T]he findings of the Commission as to the facts, if supported by the evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of the court shall be confined to questions of law.

*See Virginia Employment Commission v. City of Virginia Beach*, 222 Va. 728, 734, 284 S.E.2d 595, 598 (1981); *Lee v. Virginia Employment Commission*, 1 Va. App. 82, 85, 335 S.E.2d 104, 106 (1985).

On review, the courts must consider the evidence in the light most favorable to the finding by the Commission. *See Atkinson v. ABC Commission*, 1 Va. App. 172, 176, 336 S.E.2d 527, 529-30 (1985). In addition, as stated by the Supreme Court in *Virginia Employment Commission v. A.I.M. Corp.*, 225 Va. 338, 302 S.E.2d 534 (1983):

> The Act is to be liberally construed to effect its beneficent purpose and in borderline cases "employment" should be found to exist. Exemptions in the Act should be strictly construed against the alleged employer, the rule requiring liberal construction in favor of the taxpayer not being applicable. As defined in the Act, the term "employment" should be accorded a broader and more inclusive meaning than in the common-law context of master and servant.

*Id.* at 346, 302 S.E.2d at 539 (citations omitted).

P.E.P. cites *Wallace v. Annunzio*, 411 Ill. 172, 103 N.E.2d 467 (1952) as authority for its contention that the physicians were independently established professionals. In that case, the Supreme Court of Illinois held that associates of a patent law firm were not performing services for an employing unit within the meaning of the Illinois unemployment statute. The court, in *dicta*, identified the facts that would have persuaded it to hold the attorneys eligible for an exemption under the statute if the case had not been determined on the "employing unit" language. *Id.* at 181, 103 N.E.2d at 471. P.E.P. emphasizes two factors discussed by the court: (1) the associates were licensed attorneys; (2) the associates

had been practicing independently before their association with the firm. Likewise, P.E.P. argues, in the case at bar, all of the physicians under contract to P.E.P. are independently licensed by the state and could continue their practice of medicine even if P.E.P. ceased to exist.

For further support P.E.P. cites the Federal Unemployment Tax Regulations which state: "Individuals such as physicians . . . engaged in the pursuit of an independent . . . profession, in which they offer their services to the public, are independent contractors and not employees." 26 C.F.R. §31.3306 (i)-1(b). However, the fact that an exemption may exist under federal law is not determinative of whether an exemption exists under the Virginia Act. *See Standard Dredging Corporation v. Murphy*, 319 U.S. 306 (1943); *Claim of Cassaretakis*, 289 N.Y. 119, 44 N.E.2d 391, *aff'd* 319 U.S. 306 (1942); *see also* 51 A.L.R. Fed 59 (1981).

P.E.P. also argues that the fact that these physicians would remain physicians even if their affiliation with P.E.P. were terminated leads to the conclusion it should not be liable for the tax since the nature of the doctors' professional skills makes it unlikely they would be subject to the ordinary hazards of unemployment. This argument, carried to its logical conclusion, would exempt many other skilled workers whose skills would survive the demise of their current employment situation. The skilled auto mechanic, carpenter, stone mason, architect, engineer and others, assuming they could overcome the initial "control" requirement, would also be exempt from the act. While the doctor might not be subject to the *same* hazards of unemployment as the remainder of the workforce, we reject the argument that P.E.P should be exempt simply because the doctors do not need the protection. There is no evidence that the General Assembly intended to exempt workers on this basis.

The issue in this case is what constitutes an "independently established . . . profession." While a number of state courts have discussed the phrase in the context of their unemployment benefit statutes, they have done so mostly in *dicta,* since the majority of cases were determined on the inability of the putative employer to prove lack of control over the employees' work. In *Spahn v. Department of Labor*, 25 Ill. 2d 482, 185 N.E.2d 231 (1962), the Supreme Court of Illinois discussed the "independent trade or business" exemption allowed under Illinois law in the context of

music and dance instructors who rented studio space from the appellees. The court decided that the instructors were not free from control by appellees, but went on to state that to qualify under the "independent business" exemption one would have to prove they had a proprietary interest to the extent of being able to operate without hindrance from anyone and the ability to sell or give the business away. The court noted that while some of the instructors were also employed elsewhere, they were still largely dependent on appellees for furnishing students. The other important factors identified were that the instructors were not responsible for a proportionate share of expenses and they did not participate in the operational aspects of the schools as they would in a joint venture or partnership. *Id.* at 490, 185 N.E.2d at 235.

In *Bluto v. Department of Employment Security*, 135 Vt. 205, 373 A.2d 518 (1977), the Supreme Court of Vermont construed the corresponding subsection of their statute and stated:

> We have construed this subsection to require that a showing be made that the claimant was engaging in such independent activity "at the time of rendering the service involved." While some evidence was presented to support the view that the claimant had, in the past, engaged in an independently established carpentry trade, we find no persuasive evidence which would demonstrate that, at the time that he rendered the service in question, the claimant was able to engage in this independent activity "without any hindrance from any individual whatsoever."

*Id.* at 209, 373 A.2d at 512 (citations omitted).

In *Tri-Cities Nurses Registry v. Ross*, 56 A.D.2d 964, 393 N.Y.S.2d 98 (1977), the Supreme Court of New York held that sufficient evidence had been presented to meet the "independently established" criteria. The facts in that case involved the utilization of the answering service of a nurses registry corporation by nurses to obtain employment in their areas of competence. The court held the evidence clearly showed the nurses had joined together in an ad hoc group to present themselves more effectively to the public as to their availability as non-hospital nursing duties. The facts the court found convincing were as follows:

[T]he nurses were not paid by Tri-Cities Nurses Registry, Inc.; that the nurses shared fees paid weekly to Tri-Cities by the patients and the nurses, as a group, determined who had rendered services and the sum to which they were entitled. Further, there was substantial evidence before the Referee that no nursing services were performed on appellant's premises; that any one of the nurses' group could, and did, man the answering service maintained by appellant and either accept the call herself or refer it to another nurse; that appellant did not supervise or control either the availability of any member of the group or insist on any schedule or penalize any nurse who refused a job or in any manner control, direct or supervise the work of any member.

*Id.* at 964, 393 N.Y.S.2d at 99.

■ The Supreme Court of Virginia, in *Life and Casualty Insurance Co. v. Unemployment Compensation Commission*, 178 Va. 46, 16 S.E.2d 357 (1941), quoted with approval the following statement by the predecessor of the Commission:

And again in speaking of being "engaged in an independently established trade . . . or business" the commission said:

"We think that it is elemental that one engaged in an independent enterprise, business or profession has a proprietary interest therein to the extent that he can operate it without hindrance from any individual or force whatsoever. These agents have no business to which they have a right to continuity. They have nothing they can sell or give away . . . . The contract may be terminated by the company at any time without liability on its part for damages for breach of contract — a fact which negatives the existence of an independent relationship."

178 Va. at 55-56, 16 S.E.2d at 361.

■ The Court further explained their interpretation of the "independent business" definition in *Unemployment Compensation Commission v. Collins*, 182 Va. 426, 29 S.E.2d 388 (1944). In

that case the Court stated:

> It will be observed that in order to escape the provisions of the statute the requirement is not that the alleged employee be engaged in an "independent business." He must be engaged in one that is "independently established." An "established" business is one that is permanent, fixed, stable, or lasting.

182 Va. at 437, 29 S.E.2d at 393.

We hold that the evidence offered by P.E.P. fell short of showing the physicians had either a proprietary interest in P.E.P. or were engaged in an "independently established . . . profession" that was permanent, stable and lasting. Dr. Hunter's testimony indicated that, generally, the full-time physicians did not have separate practices other than their work at Hampton General and the outpatient facility, but all of the part time doctors were engaged either in practice with the military or were in residency programs at Eastern Virginia Medical School in Norfolk, Virginia. Dr. Hunter testified that there were between five and eight doctors on salary, but probably five.

Q: Probably 5? Of that 5, how many have separate practices?

A: They're all full-time emergency physicians. That is their only practice.

Q: I'm sorry.

A: They are all full-time emergency physicians. I should, (sic) that's not the correct answer. Some of them do see patients in other settings. I see patients at my house, for example, sometimes. I think all of the physicians probably do that, see patients at either their house or maybe even some other office setting. Some of those 5 physicians maintain an office in another location in their home, some in the home, some not at all, I guess.

While Dr. Hunter incorporated his practice and had P.E.P. pay his earnings to his corporation, which paid unemployment taxes

on his wages, there was no evidence that other doctors under contract to P.E.P. were similarly situated. Not all of the full time doctors were paid in the same manner and it was unclear how many of the full time doctors were shareholders and thus entitled to share in the excess money left after payment of salaries and bills. While the evidence indicated that all doctors shared some of the risk of unpaid patient bills, this proved nothing more than use of standard business practices where a corporation determines certain factors into the formula used to set wages. While P.E.P.'s shareholders certainly had a proprietary interest in the corporation, the evidence did not indicate with any certainty how many of the approximately thirty doctors under contract were shareholders. It is clear from the evidence that not *all* doctors were shareholders.

While it is possible that Dr. Hunter or some of the other physicians under contract to P.E.P. might have an "independently established . . . profession," the evidence was insufficient to prove that P.E.P. should be exempt from liability for payment of the unemployment tax for all of the physicians it had contracted with.

For these reasons, the judgment of the trial court is reversed, the Commission's decision in this matter dated April 8, 1986, is reinstated, and final judgment is entered in favor of the Commission.

*Reversed and final judgment.*

Benton, J., and Duff, J., concurred.