(No. 71146.—)

JACK BRADLEY, INC., Appellant, v. THE DEPART-
MENT OF EMPLOYMENT SECURITY *et al.*, Ap-
pellees.

*Opinion filed December 19, 1991.—Rehearing
denied February 3, 1992.*

62

HEIPLE, J., took no part.

Michael A. Fleming, of Cusack & Fleming, of Peoria, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Daniel N. Ma-

lato, Assistant Attorney General, of Chicago, of counsel), for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

The plaintiff, Jack Bradley, Inc. (Bradley, Inc.), sought an administrative review of a decision by defendant Sally A. Ward, Director of Employment Security (Director), which adopted and affirmed an Illinois Department of Employment Security (Department) representative's determination that services performed by food demonstrators for plaintiff are "employment" under the Unemployment Insurance Act (the Act) (Ill. Rev. Stat. 1987, ch. 48, par. 316); that such services are not exempt under section 212 of the Act (Ill. Rev. Stat. 1987, ch. 48, par. 322); and that plaintiff owes $13,898.16 plus interest in unpaid unemployment contributions. The circuit court reversed the Director's decision as against the manifest weight of the evidence. The appellate court reversed the judgment of the circuit court. (204 Ill. App. 3d 708.) Plaintiff now appeals from the judgment of the appellate court under Supreme Court Rule 315 (134 Ill. 2d R. 315).

The issue presented on review is whether the Director's decision, that services of certain food demonstrators are "employment" (Ill. Rev. Stat. 1987, ch. 48, par. 316) and are not exempt under section 212 of the Act, is against the manifest weight of the evidence. A related issue is whether the Department was estopped from determining that the services of Bradley, Inc.'s food demonstrators were "employment" and thus subject to unemployment contributions. After careful consideration of the matter, we conclude that the Director's decision was not in error and that the Department was not estopped. Accordingly, we affirm.

## FACTUAL BACKGROUND

Jack Bradley, Inc. (Bradley, Inc.) is a company formed in 1977 by Jack Bradley and his son, Mark Bradley, which is located in Chillicothe, Illinois. Bradley, Inc. is involved in the advertising and public relations business. The company is comprised of three divisions, Media Consultants, an advertising agency; Jack Bradley Photo and Frame Shop, a retail photo/camera and custom picture-framing shop; and Media Consultants Marketing, which provides food demonstrators for food vendors or retailers. Food demonstrators are persons who demonstrate and offer food and other product samples to the consuming public. Such demonstrations usually take place in supermarkets. Mark Bradley, Bradley, Inc.'s vice-president, has described Media Consultants Marketing as a "demo" company.

In 1983, the Department first considered whether Bradley, Inc.'s food demonstrators were employees under the Act when a demonstrator filed a claim seeking unemployment compensation. Bradley, Inc. registered its protest to the claim on the theory that the demonstrator was an "independent contractor" whose services were exempt under section 212 of the Act (Ill. Rev. Stat. 1987, ch. 48, par. 322).

In September 1983, as a result of a Department audit, Department representatives Jim Kelly and Lee Pickens met with Bradley, Inc.'s representatives, Mark Bradley, Jack Bradley, and Steven Cushing. At the time, some of the food demonstrators had signed written contracts with Bradley, Inc. stating that they were independent contractors and some had not.

According to Bradley, Inc., Pickens decided at this meeting that food demonstrators who had not signed a written contract with Bradley, Inc. would be subject to unemployment contributions and those who had signed

would not be subject to contributions. Bradley, Inc. conceded, and agreed to compile a list of those demonstrators who had not signed contracts so that Kelly could determine the amount of contributions owed. This understanding or agreement was not reduced to writing. Bradley, Inc. subsequently compiled the list, but Kelly did not revisit Bradley, Inc.'s offices to review it. Bradley, Inc. also advised all its food demonstrators that they were required to be under contract.

In July 1985, Kelly's replacement at the Department, Suzanne Faulkner, contacted Bradley, Inc. concerning records for its food demonstrators. Cushing advised Faulkner that, in 1983, the agreement described above had been reached. He offered to make available those records showing amounts paid to food demonstrators who had not signed contracts. Consequently, Faulkner checked with Pickens, who denied that any such agreement had been reached. Faulkner then requested all of Bradley, Inc.'s records.

On December 2, 1986, and April 9, 1987, the Director served Bradley, Inc. with "Notices of Determination and Assessments and Demands for Payment." The notice of determination stated that Bradley, Inc. failed to make unemployment contributions and therefore owed the Department contributions plus interest and penalties. Bradley, Inc. filed protests and petitioned for an administrative hearing.

On August 26, 1987, an administrative hearing was held before a representative of the Director. Bradley, Inc. presented exhibits and the testimony of Mark Bradley, its vice-president, Steven Cushing, its auditor, and Betty Thomas, a food demonstrator. The evidence presented during the hearing was not in substantial dispute and is summarized below.

Bradley, Inc. maintains a list of 200 to 250 available food demonstrators. Bradley, Inc. has compiled this list

by advertising for people who have experience in food and beverage sampling and by also receiving referrals from its listed demonstrators. Food vendors and retailers contact Bradley, Inc. for these food demonstrators' services and Bradley, Inc. then contacts a listed demonstrator. Approximately 20% of Bradley, Inc.'s total business is derived from arranging jobs between vendors or retailers and demonstrators.

Before being placed on the list, all demonstrators sign a written contract provided by Bradley, Inc. stating a standard hourly rate of pay. The agreement is a nonexclusive form agreement, and further states that demonstrators are not employees but "independent contractor[s]" who have "sole control of the manner and means of performing" their services. The contract provides that either party may terminate the agreement upon written notice. By 1987, all demonstrators listed with Bradley, Inc. had signed the contract.

The food demonstration job process begins when a food vendor or retailer contacts Bradley, Inc. and provides it with information concerning a food demonstration that the vendor or retailer wishes to schedule. The vendor or retailer determines the date of the demonstration, the starting and ending times for the demonstration, and the product to be demonstrated. Bradley, Inc. then contacts food demonstrators on its list to find someone to perform the job. When contacted by Bradley, Inc., a demonstrator may refuse the job because of either personal or business plans, the locale of the demonstration, or personal feelings about the product. No penalty results from a refusal.

When a listed food demonstrator accepts a job, Bradley, Inc. provides the demonstrator with information about the job such as where the demonstrator is to report and who the demonstrator should contact. Bradley, Inc. subsequently sends a written confirmation "slip"

with information about the job to the demonstrator. Bradley, Inc. also sends the demonstrator a "time sheet."

After receiving the information about a job from Bradley, Inc., the food demonstrator reports to the designated location, usually a supermarket, on the specified date. No demonstrations take place in Bradley, Inc.'s offices. Betty Thomas testified that after checking in with the supermarket's management, she performs an "inventory check" by counting and recording the number of demonstration products on hand at the store. The particular food vendor determines whether an inventory check is required. A demonstrator then sets up her demonstration area.

Equipment and supplies are provided at the store by either the food vendor or retailer. A demonstrator may bring his or her own supplies. Bradley, Inc. provides no training to the food demonstrators, but it may, in some instances, provide demonstrators with written food preparation and demonstration guides which Bradley, Inc. receives directly from food vendors. Food vendors and retailers provide the demonstrators with instructions concerning presentation, set-up, food preparation and serving. They may also provide demonstrators with product information and the same type of written preparation guides which Bradley, Inc. receives directly from vendors.

No one from Bradley, Inc. instructs or supervises the food demonstrators at the job site. However, Bradley, Inc. had at one time employed a "supervisor" for its demonstrators in the southern Illinois area because the company needed "help with the hands-on operation of the contract work [Bradley, Inc.] did down there." If a problem arises at the job site, supermarket management or the food vendor advises the demonstrator.

When a job is completed, the food demonstrator may take an "ending" inventory if required by a vendor. The demonstrator records the "ending" inventory on a sheet which others send to Bradley, Inc. The demonstrator also reports in writing the number of items "demoed" and leaves this report for the food vendor at the store. Thomas testified that she did not punch a time clock owned or controlled by Bradley, Inc. but she did record her time on a "time sheet," signed by a store manager, which she sent to Bradley, Inc. or "whomever [she was] working for" after she completed a job. Demonstrators for Bradley, Inc. are paid twice a month. If a demonstrator's job performance is unsatisfactory, Bradley, Inc. will simply cease calling that demonstrator for jobs.

Thomas further testified that when she began working for Bradley, Inc., the company paid $4.50 an hour, as was specified in its contract. When asked whether every demonstration job through Bradley, Inc. was paid at this standardized rate, Thomas said "No." She then immediately explained that "different companies" pay different rates. (Thomas' further explanation, however, specifically referred to both vendor and "demo" companies alike, so that it is not clear that Thomas understood that she was being questioned about whether Bradley, Inc. had a standardized rate as opposed to being questioned about a standardized "demo" industry rate. In either case, it appears that Thomas did not determine her rate of pay.) In situations where the supply of products was depleted and Thomas was unable to continue a demonstration, she would be paid for the full period of time that she was scheduled to work. Her individual contract with Bradley, Inc. was offered into evidence and provided that her rate of payment was $36 per eight-hour day.

Thomas further testified that she was given "some" jobs by food vendors. As an example of how she might obtain such work, Thomas testified that the vendors

knew that she was a demonstrator, having seen her in stores "before"; and that they would call her when they needed a demonstrator. Thomas stated that she had worked for Oscar Mayer and Kitchen Made Potato Chips in this manner. However, when later questioned about what work she had performed since 1984, after starting with Bradley, Inc., Thomas twice identified only one vendor, Oscar Mayer.

Thomas also testified that she had been called to perform work for "Demos Unlimited," another "demo" company similar to Bradley, Inc., but that she had not taken jobs for them because they paid slowly. She also stated that since 1984, she had worked for "Stella Sample and Sales, Inc.," another company similar to Bradley, Inc. for "a while." With respect to her relationship with Bradley, Inc., Thomas testified that she viewed it as the "same" as her relationship with Oscar Mayer or Stella Sample; "[t]his was another contract, another contract, I should say, with the food broker. In order for me to gain jobs." Mark Bradley testified that it was not unusual for demonstrators listed with Bradley, Inc. to work for other companies and food vendors.

With respect to the payment of taxes, Thomas testified that social security and income taxes were not deducted from the income she received from Bradley, Inc. She agreed that she probably received a "1099" income reporting form from Bradley, Inc. at the end of the year showing the amount she earned which she estimated as under $3,000 for 1986. She also agreed that she reported her income from the various sources from which she had received it on her tax return. She was unclear, however, about whether each source was listed separately on the return because, as she explained, someone else prepared the return while she was in their presence. She further admitted, however, that in 1986 her only source of income, other than Bradley, Inc., had been social security.

Thomas testified that she did not fill out a tax return schedule showing she operated a business, nor did she take any deductions for business expenses. A copy of Thomas' tax return was not offered into evidence. She agreed that it was a very short form. Mark Bradley testified that the average demonstrator listed by Bradley, Inc. made "significantly less" than Thomas, between $500 and $1,000.

Based upon this evidence, the Director's representative issued his report finding that the services of Bradley, Inc.'s food demonstrators were "employment" and not exempt under section 212 and assessing Bradley, Inc. for unpaid unemployment contributions. With respect to section 212's specific provisions, he found that Bradley, Inc. had not shown that the demonstrators met the standards of section 212(C) (Ill. Rev. Stat. 1987, ch. 48, par. 322(C) ("engaged in an independently established trade, occupation, profession, or business")). In the representative's view, the demonstrators, particularly Thomas, did not demonstrate indicia typically associated with independently established businesses, such as "business" investment and "ordinary" business operating expenses. Neither had Bradley, Inc. demonstrated that it met the two additional requirements of sections 212(A) and (B) (Ill. Rev. Stat. 1987, ch. 48, pars. 322(A), (B)), inasmuch as Bradley, Inc. maintained a right of control by virtue of its dictation of the terms of the demonstrators' contract concerning services and assignment; and the demonstrators' services were performed within areas where Bradley, Inc. carried out contracts within the course of its business.

Following the filing of objections by Bradley, Inc., the Director issued her decision, affirming and adopting her representative's report. The Director specifically found that the requirement of section 212(C) had not been met,

and that the Department was not estopped from assessing contributions.

In May 1988, Bradley, Inc. filed a complaint for administrative review in the circuit court of Peoria County. In August 1989, the circuit court reversed the Director's decision, finding that it was against the manifest weight of the evidence and contrary to law. The Director subsequently appealed. The appellate court reversed the circuit court's decision as incorrect. (204 Ill. App. 3d at 716.) We granted Bradley, Inc.'s petition for leave to appeal (134 Ill. 2d R. 315).

## STANDARD OF REVIEW

The trial court is empowered to review the decisions of the Director of Employment Security subject to section 3—104 of the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 et seq.). The findings of fact of the Director are considered prima facie correct (Spahn v. Department of Labor (1962), 25 Ill. 2d 482, 490), and should not be disturbed unless contrary to the manifest weight of the evidence (Myers v. Cummins (1956), 9 Ill. 2d 582, 588; Griffitts Construction Co. v. Department of Labor (1979), 76 Ill. 2d 99, 104). A decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent. In re Estate of Lukas (1987), 155 Ill. App. 3d 512, 521.

## DISCUSSION

"[T]he Unemployment Compensation Act is not a taxing act, but is one passed to alleviate the perils of unemployment under the police powers of the State, and should receive a liberal construction." (Eutectic Welding Alloys Corp. v. Rauch (1953), 1 Ill. 2d 328, 332; see Ross v. Cummins (1956), 7 Ill. 2d 595, 597; Legal Process Service, Inc. v. Ward (1988), 165 Ill. App. 3d 83, 89.) In dis-

cussing the expansive breadth of the Act's purpose, this court has stated:

> "[T]he scope of the statutory purpose [of the Act] 'is so broad that it necessarily includes all types of the unemployed, and all the relations through which compensation for services is made, without regard to the legal designation of the relations under which, previously, pay had been made for such services ***. The fact that [the Act's] specifications and definitions may properly embrace an employment as it is customarily understood does not prevent its including within the statutory terms those who, before its enactment, might not have been regarded as being in "employment," or as being employers, or those bearing the relation of independent contractors, or other relations different from that strictly of employee at common law.' " *Beth Weber, Inc. v. Murphy* (1945), 389 Ill. 60, 65, quoting *New York Life Insurance Co. v. Murphy* (1944), 388 Ill. 316, 319.

Thus, in determining whether an employment relationship exists, the common law concepts of master-servant and independent contractor are not controlling; one must look to the broader statutory definitions. (See *A. George Miller, Inc. v. Murphy* (1942), 379 Ill. 524; *Peasley v. Murphy* (1942), 381 Ill. 187, 192; *Griffitts Construction Co.*, 76 Ill. 2d at 103-04.) Also, while a dictionary definition of the terms "employment" and "independent contractor" may prove helpful to an understanding of the basic concepts of such relationships under the statute, such a definition in no way circumscribes the scope of statutory relationships.

Under the Act, "employment" is defined as any service performed by an individual for an employing unit. (Ill. Rev. Stat. 1987, ch. 48, par. 316.) From this broad definition of "employment," various exceptions have been carved, the most frequently encountered being that of section 212, which provides an exemption for independent contractors. (Ill. Rev. Stat. 1987, ch. 48, par. 322.)

Under the Act, "[s]ervice performed by an individual for an employing unit *** shall be deemed to be employment unless and until it is proven in any proceeding where such issue is involved that— [A] [s]uch individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and [B] [s]uch service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and [C] [s]uch individual is engaged in an independently established trade, occupation, profession, or business." Ill. Rev. Stat. 1987, ch. 48, par. 322.

The three requirements of section 212 are conjunctive; once a service is shown, the employer must prove all three to exempt himself from applicability of the Act. (*Murphy v. Daumit* (1944), 387 Ill. 406, 413-14; *Ross v. Cummins*, 7 Ill. 2d at 597; *Griffitts Construction Co.*, 76 Ill. 2d at 104.) Furthermore, because the Act was enacted with the public welfare in mind, construction of its provisions should favor inclusion, and there is a strict burden of proof placed upon one claiming an exemption. *Griffitts Construction Co.*, 76 Ill. 2d at 104; *Grant Contracting Co. v. Murphy* (1944), 387 Ill. 137, 148; *Bennett v. Department of Employment Security* (1988), 175 Ill. App. 3d 793, 796.

In the present case, Bradley, Inc. contends that it served merely as a conduit between food vendors, retailers and demonstrators, relaying requests and information. This characterization, however, misapprehends the true nature of the parties' relationship. In determining what constitutes "employment" under the Act, we must investigate the relationship of the parties by examining the incidents and circumstances surrounding any job classification, so that it may be determined what the re-

lationship was in fact. In this regard, designations and terminology used by the parties are not controlling. *Daumit*, 387 Ill. at 415; *Griffitts Construction Co.*, 76 Ill. 2d at 104.

Bradley, Inc. operates as something more than simply a referral agency between vendors and demonstrators. Rather, Bradley, Inc.'s food demonstrators performed services for Bradley, Inc. by conducting demonstrations which Bradley, Inc. had by separate agreement promised to provide to vendors and retailers. Nothing more strongly evidences this relationship than the controls Bradley, Inc. exerted relative to its own profits and the demonstrators' remuneration.

Here, food vendors and retailers paid directly to Bradley, Inc. for each demonstration, rather than to the individual food demonstrator. Further, Bradley, Inc., rather than the individual demonstrator, kept track of the time that the demonstrator worked. When this arrangement is considered with the fact that Bradley, Inc., rather than the individual demonstrator, determined the demonstrator's rate of pay, and hence, Bradley, Inc.'s percentage of return, it becomes clear that the demonstrators were performing services that benefited Bradley, Inc. Under the Act, we are concerned with economic realities. (*Myers v. Cummins*, 9 Ill. 2d 582.) In view of these circumstances, because the demonstrators' services were performed for Bradley, Inc. they are considered "employment" under the Act. It remains, however, to be decided whether Bradley, Inc. carried its burden of proving the three requirements of section 212 which are necessary to relieve it from the obligations of an employer.

While the Director's decision adopted and affirmed the representative's report in total, the decision only specifically addressed Bradley, Inc.'s proof of section 212(C). The three requirements of section 212 must be concurrently satisfied, so that the inability to satisfy any

one requirement results in the exemption's unavailability. Thus, we need only review the Director's decision concerning section 212(C).

We believe that Bradley, Inc. failed to sufficiently establish that the requirement of section 212(C) (independently established business) was met. (Ill. Rev. Stat. 1987, ch. 48, par. 322(C).) The appropriate test, when considering whether this standard has been met, was stated in *Daumit*, 387 Ill. 406. "[T]he act contemplates that one who is engaged in an independent enterprise is an individual who has a proprietary interest in such business to the extent that he can operate [the] same without hindrance from any individual whatsoever and whose business also is free from control." *Daumit*, 387 Ill. at 417.

In *Daumit*, the court considered the status of sales representatives who sold vacuum cleaners house-to-house, over whom the employer exercised little control as to working hours; who were given discretion to grant customers a discount allowance; and whose contract with the employer stated that they had purchased the cleaners in advance of sale. In applying the above-mentioned standard, this court looked to the fact that the alleged independent contractors "had no business to sell or give away"; and although they were free to sell and service other products, no evidence existed that they in fact did so. *Daumit*, 387 Ill. at 417.

On the issue of an appropriate standard, the appellate court in the present case found persuasive the reasoning of a Missouri appellate court decision, *Sample & Sell, Inc. v. Labor & Industrial Relations Comm'n* (Mo. App. 1988), 764 S.W.2d 109, which also considered whether food demonstrators were independent contractors under an unemployment security provision identical to section 212. According to the Missouri court, the reason for the third statutory exemption requirement is to include in coverage those many persons whose activities are free

from the detailed control of an employer, but whose independence is, nonetheless, "not the kind of independence which commonly rids the true entrepreneur of the risk of employment." (*Sample & Sell*, 764 S.W.2d at 112.) Thus, "[t]he ultimate issue is whether the person performing the services was engaged in an entrepreneurial enterprise which enjoyed a degree of economic independence such that the enterprise could survive any relationship with the particular person contracting for services." (*Sample & Sell*, 764 S.W.2d at 112.) The Missouri court concluded that where workers were not capable of providing their services without dependence upon another entity, they could not be considered to have met the statutory requirement. We also find this reasoning persuasive as it comports with our long-held view that the test for the requirement of section 212(C) is that an employee's "business" be capable of operation without hindrance from any other individual. See *Daumit*, 387 Ill. at 417.

We disagree with Bradley, Inc. that *Sample & Sell* is unpersuasive because of factual distinctions that demonstrators there were supplied some equipment by the employer, had no written contract, and no evidence was presented that demonstrators worked directly for vendors. The first two distinctions are irrelevant since it is clear that control was not the dispositive issue in *Sample & Sell*; rather, *Sample & Sell* turned upon the capacity of the demonstrators to operate as businesses independently of the "demo" company. Thus, the only remaining pertinent distinction between the present case and *Sample & Sell* is that, here, Thomas testified that she received some work directly from a vendor. First, the test enunciated in *Sample & Sell* comports with the test stated in *Daumit*, regardless of the facts; and second, any factual distinction between *Sample & Sell* and the

present case is only a matter of the degree of proof offered.

In the case at hand, Bradley, Inc. carried a strict burden of proof to show that Bradley, Inc.'s food demonstrators engaged in an independently established occupation or business. As recognized in *Bennett v. Department of Employment Security*, 175 Ill. App. 3d at 796, the entire burden is upon the employer, and the Department is not required to come forward with any evidence. In this case, Bradley, Inc. attempted to carry this strict burden of proof with the form contract stating that food demonstrators were "independent contractors"; Thomas' testimony that after starting with Bradley, Inc. in 1984, she had worked for a vendor, Oscar Mayer; her somewhat equivocal testimony that she had worked for another vendor, Kitchen Made Potato Chips; and her testimony that she had worked for a "demo" company, Stella Sample and had been called by another "demo" company, Demos Unlimited. However, any implication as to the frequency of these activities was undercut by Thomas' testimony that in 1986, she took jobs only from Bradley, Inc. Other than Mark Bradley's testimony that other less active demonstrators listed with Bradley, Inc. also worked directly for vendors and other "demo" companies; and that the National Association of Demonstration Companies considered demonstrators as independent contractors, this was the extent of the proofs Bradley, Inc. offered concerning the status of its food demonstrators. In arguing its case, Bradley, Inc. referred to administrative decisions in other States which concerned relationships between employers other than Bradley, Inc. and food demonstrators.

These proofs were considerably offset by Thomas' testimony that she had claimed no business expense deductions and had only filed a short tax form (whether proper or not). The record reflects as well, that Thomas

possessed little appreciation for any distinction between vendor and "demo" company, which fact tends to show that Thomas did not engage in substantial direct contracts with her likely clients, food vendors. "[R]elationship[s] must be determined from all of the actual facts in evidence." *Daumit*, 387 Ill. at 415.

Further, we do not believe that Thomas' testimony that she worked for another "demo" company necessarily demonstrates that she and Bradley, Inc.'s other food demonstrators were independent contractors within the meaning of the statute. Any relationships with other "demo" companies may simply have been like that of Thomas' relationship with Bradley, Inc., part-time employment. (See *Ross v. Cummins*, 7 Ill. 2d at 601 (another job does not of itself constitute such independent engagement or establishment in business as to prevent the one so involved from being in the employment of another).) The focus of any inquiry should rather be upon whether Bradley, Inc.'s food demonstrators had businesses or occupations which were capable of operation independent of a relationship with Bradley, Inc. or other such "demo" companies, *i.e.*, operations directly with vendors. See *Legal Process Service, Inc. v. Ward* (1988), 165 Ill. App. 3d 83 (process servers for the most part only served papers through employer and were largely dependent upon that relationship for the income from such jobs).

We note also that Bradley, Inc., rather than each demonstrator, provided the written contract which the parties signed; Bradley, Inc., rather than each demonstrator, determined the rate of payment; and demonstrators completed time sheets which were provided by Bradley, Inc. In sum, the evidence reveals no proprietary interest of Thomas or any other demonstrator in any food or product demonstration business, nor does it show that demonstrators were able to operate on their

own largely without the benefit of a relationship with a "demo" company.

Based upon this record, we believe that Bradley, Inc. failed to carry its strict burden of proof demonstrating that its food demonstrators were engaged in independently established occupations or businesses. The Director therefore had substantial basis to conclude that the requirement of section 212(C) had not been met and that services of food demonstrators performed for Bradley, Inc. were "employment" subject to contributions under the Act.

Bradley, Inc. also contends that the Department was estopped from determining that services of food demonstrators were "employment" and from assessing unemployment contributions thereon. Specifically, Bradley, Inc. argues that the alleged decision in 1983, by a Department employee, Lee Pickens (that the services of food demonstrators who had written contracts with Bradley, Inc. would not be subject to unemployment contributions), estopped the Department from later determining that these services were "employment" under the Act. We disagree.

The doctrine of estoppel applies against the State only when there have been "some positive acts by [State] officials which may have induced the action of the adverse party under circumstances where it would be inequitable to permit [that party] to stultify itself by retracting what its officers had previously done." (*Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, 448-49.) The doctrine is invoked only to prevent fraud and injustice. (*Rockford Life Insurance Co. v. Department of Revenue* (1986), 112 Ill. 2d 174, 185; *Hickey*, 35 Ill. 2d at 449.) This is especially true when the public revenues are involved. *Rockford*, 112 Ill. 2d at 185-86.

For example, this court has previously held that the State is not estopped from reexamining a taxpayer's lia-

bility even though the return for that period has been approved. (See *People ex rel. Scott v. Chicago Thoroughbred Enterprises, Inc.* (1973), 56 Ill. 2d 210; *Austin Liquor Mart, Inc. v. Department of Revenue* (1972), 51 Ill. 2d 1.) Similarly, in *Rockford*, 112 Ill. 2d 174, this court refused to apply estoppel even though the Department of Revenue had previously exempted certain securities held by the plaintiff from the Department's computation of the company's capital stock and the Department later sought to subject similar securities to taxation. This court held that the Department's change in policy was no more burdensome or unjust than a reexamination of a taxpayer's return.

Likewise, in the present case, even if the Department determination represented an actual change in its policy towards Bradley, Inc., which we are not convinced is the case, the result here is no more burdensome or unjust than a reexamination of an assessment of unemployment contributions. In fact, also, Pickens' decision did not induce Bradley, Inc. to act in a manner so that it became liable for unemployment contributions to any greater extent than was already the case. Under such circumstances, we do not find it necessary to apply estoppel.

The judgment of the appellate court is affirmed.

*Appellate court affirmed.*

JUSTICE HEIPLE took no part in the consideration or decision of this case.